## Commonwealth *v.* Ricci, Appellant.

Argued November 29, 1938. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Samuel Kagle,* for appellant.

*Harry Felix,* Assistant District Attorney, with him *Charles F. Kelley,* District Attorney, for appellee.

OPINION BY MR. JUSTICE STERN, January 9, 1939:

On the night of January 26, 1933, a man entered a house of prostitution in Philadelphia, shot and killed the proprietress, shot and killed one of the inmates, Susan Ricci, shot and wounded another, shot and killed a police officer, Frederick Dolan, and then made his escape.

Who was the man? That was the vital question arising from the tragedy. Defendant, Albert Ricci, the husband of Susan Ricci, was arrested four years later and charged with being the guilty person. He was tried for the killing of Dolan, and convicted of murder in the second degree. He appeals to this court.

Defendant and Susan Ricci were married in 1925, and lived together for upwards of seven years, but in the latter part of 1932 the wife took to a course of immoral living, culminating in her becoming an inmate of a house of ill-fame, first in Chester and later in Philadelphia. The attitude of defendant toward his wife's conduct is varyingly represented in the testimony, one version being that he not only acquiesced in her shameful occupation but promoted it, the other that he urged her from time to time to abandon her evil ways and return to him. While she was in the Chester house defendant and two of his companions agreed upon a plan to go there and "shoot the place up." The exact purpose of this adventure does not clearly appear; on the part of the other men it was apparently to levy blackmail or to rob; defendant's motive, as afterwards stated by him, was to get his wife out of the house and bring her home. He

borrowed a gun for the purpose but his courage failed him and the expedition was not carried out as planned.

Some of the assignments of error on the present appeal complain of the introduction into the case of this "conspiracy." It is urged that it was unrelated to the subsequent crime through any identity of purpose or otherwise, there being no "hold up" on the later occasion for the object of obtaining money. This argument overlooks defendant's confessed purpose, in entering into the original scheme, of inducing or forcing his wife to leave the house where she was engaged in prostitution. The facts concerning the plot were admissible as bearing upon the likely motive of defendant on the subsequent occasion when the murders occurred. The learned trial judge properly presented this subject to the jury from the various angles suggested by the testimony.

The major contention of defendant is directed toward what he alleges to be the meager quantity and unsatisfactory quality of the evidence establishing his identity as the perpetrator of the crime. The only eyewitness identification was by a maid who worked in the house where the murders of the women occurred, and who, in terror, hid behind a cupboard while the shooting was going on. She testified with great positiveness that defendant was the man. It is true that her facilities for observation were limited, that she exhibited hesitancy in identifying defendant upon occasions previous to the trial, and that she made contradictory statements regarding the appearance of the murderer and the likelihood of her being able to recognize him. All this, however, was for the jury, and the trial judge invoked their cautious consideration of the evidence on these points. Nor did the Commonwealth's case depend entirely upon this witness. One of the detectives testified that defendant said to him "he knew that one was justified in killing his wife and the other girl" but "What about the cop? They will hang me for that," and that on another occasion defendant said: "I will say that I killed my

wife and the other girl, but I can't say I killed the cop because they'll hang me." There was evidence, too, that Mrs. Ricci had given assurance on the very day of the murder that she would abandon her immoral life and return to defendant that night, and that he waited for her for several hours in the vain hope that she would carry out this promise. The shooting which immediately followed may well have resulted from this disappointment. Of some significance is the fact that the day after the murder defendant exhibited gross callousness in regard to his wife's death and was guilty of shockingly immoral conduct which further evidenced his indifference to her fate. On the whole, the record would have sustained not only the verdict which was rendered, but one of first degree murder, and defendant cannot complain that the jury was more merciful than logical in finding the crime to have been of the lesser degree.

One of the assignments of error is directed to the judge's statement to the jury that he "recalled nothing in the testimony" to indicate that the police had done anything illegal or improper in their handling of defendant during the period of five days when he was under detention following his arrest in 1937. The judge added, however, that it was for the jury to consider all the conditions bearing upon this matter in order to decide whether the police witnesses were telling the truth. While defendant insists that he was badgered by his captors and subjected by them to undue strain in answering questions, he does not allege any physical mistreatment, intimidation, or other reprehensible methods of evoking confessions. As a matter of fact he made no confession other than the admission in conversation with one of the detectives already referred to, and he does not contend that even that admission was illegally extracted from him, but, on the contrary, that he never made it. The question, therefore, as to defendant's treatment by the police was largely academic.

A Mrs. Bernhardt, who at the time of the murders lived across the street from the house where they occurred, made an affidavit after the trial that she saw the policeman and some man firing at one another, that the man fell to the ground holding his stomach and saying "You got me, I give up," but that he shot the officer as the latter came toward him, and then he arose and ran away still holding his stomach as though wounded there. The significance of this statement is that defendant showed no evidence of any wound a few days after the shootings. The Commonwealth had attempted to obtain Mrs. Bernhardt as a witness at the trial but could not locate her as she had moved to another part of the city, and defendant offered her affidavit as newly discovered evidence calling for the granting of a new trial. Mr. Bernhardt, the husband of this alleged witness, had testified at the trial to the same effect, even if not quite as fully, and the court properly held that the testimony of Mrs. Bernhardt, if produced, would be merely cumulative and therefore did not warrant the granting of a new trial on the ground of after-discovered evidence. Neither Mr. nor Mrs. Bernhardt could say that the man was actually shot by the officer, and it is just as possible that he merely simulated injury for the purpose, successfully executed, of luring the officer into the unguarded approach which resulted in his tragic death.

Defendant's final complaint concerns the admission in evidence of a conversation between the housemaid and a policeman, in which she was told by him that defendant was locked up at the time of the murders and therefore could not have committed them. She advanced this as a reason why originally she was hesitant in her identification of defendant. Another conversation was admitted which occurred between a member of the bar and a captain of police in which the latter made a similar statement, this being offered in Commonwealth's rebuttal as corroborative of the maid's testimony in that regard. It is objected that these conversations, occurring

in the absence of defendant, were hearsay, and as such inadmissible in evidence. This objection is based upon a not uncommon misapprehension of the hearsay rule. The testimony of a witness as to what some other person said is properly excluded when offered as evidence of the truth of the fact asserted, but the rule does not apply where the testimony is offered merely to prove that the statement was made. It is clear that, when stress was laid by defendant upon the maid's vacillation in identifying him, she was justified in accounting for her hesitancy by the fact that she had been told by the police that defendant could not have committed the crime because he was under confinement at the time it occurred.

A careful consideration of the lengthy record in this case leads readily to the conclusion that there was a full presentation and discussion of all relevant evidence, that the charge of the trial judge was clear, fair and devoid of error, and that the evidence was sufficient to justify the jury in believing beyond a reasonable doubt that defendant committed the murder with which he was charged. Under such circumstances the judgment should be, and is, affirmed.