568 A.2d 600

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Jay C. SMITH, Appellant.**

Supreme Court of Pennsylvania.

Argued May 12, 1988.

Decided Dec. 22, 1989.

578

William C. Costopoulos, Lemoyne, for appellant.

Robert A. Graci, Chief Deputy Atty. Gen., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

OPINION

NIX, Chief Justice.

In this appeal this Court must review the three sentences of death imposed upon appellant, Jay C. Smith, by the Court of Common Pleas of Dauphin County for the first degree murder convictions of Susan Reinert and her two children, Michael and Karen Reinert. Appellant raises nineteen assignments of trial error for our review, including a challenge that the evidence is insufficient as a matter of law to sustain the convictions of three counts of murder in the first degree.

In accordance with our responsibility in cases in which the death penalty has been imposed by the finder of fact, this Court has the independent statutory obligation to review the sufficiency of the evidence supporting the conviction. 42 Pa.C.S. § 9711(h). *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). The test to be applied is whether, viewing all of the evidence in the light most favorable to the Commonwealth as verdict winner, and drawing all reasonable inferences favorable to the Commonwealth, there is sufficient evidence to enable the trier of fact to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Jermyn*, 516 Pa. 460, 533 A.2d 74 (1987); *Commonwealth v. Sneed*, 514 Pa. 597, 526 A.2d 749 (1987); *Commonwealth v. Holzer*, 480 Pa. 93, 389 A.2d 101 (1978); *Commonwealth v. Kichline*, 468 Pa. 265, 361 A.2d 282 (1976).

The Commonwealth need not prove the homicide by direct evidence; indeed in many instances, no witnesses are available to describe the incident which resulted in the death of the victim. Rather the Commonwealth may prove the homicide by circumstantial evidence. *See, e.g., Commonwealth v. Romano*, 392 Pa. 632, 141 A.2d 597 (1958); *Commonwealth v. Lettrich*, 346 Pa. 497, 31 A.2d 155 (1943). The Commonwealth may establish the fact of a homicide by proving the death of the victim and establishing

that the death resulted from criminal means. *Commonwealth v. Williams,* 455 Pa. 539, 316 A.2d 888 (1974); *Commonwealth v. Dews,* 429 Pa. 555, 239 A.2d 382 (1968); *Commonwealth v. Frazier,* 411 Pa. 195, 191 A.2d 369 (1963); *Commonwealth v. Deyell,* 399 Pa. 563, 160 A.2d 448 (1960); *Commonwealth v. Homeyer,* 373 Pa. 150, 94 A.2d 743 (1953).

In assessing the sufficiency of the evidence to establish that a homicide was committed and that the person or persons charged were those responsible, we are called upon to consider all of the testimony that was presented to the jury during the trial, without consideration as to the admissibility of that evidence. The question of sufficiency is not assessed upon a diminished record. *Commonwealth v. Rawles,* 501 Pa. 514, 462 A.2d 619 (1983); *Commonwealth v. Lovette,* 498 Pa. 665, 450 A.2d 975 (1982), *cert. denied,* 459 U.S. 1178, 103 S.Ct. 830, 74 L.Ed.2d 1025 (1983); *Commonwealth v. Cohen,* 489 Pa. 167, 413 A.2d 1066, *cert. denied,* 449 U.S. 840, 101 S.Ct. 118, 66 L.Ed.2d 47 (1980); *Commonwealth v. Harper,* 485 Pa. 572, 403 A.2d 536 (1979); *Commonwealth v. Hoskins,* 485 Pa. 542, 403 A.2d 521 (1979); *Commonwealth v. Firth,* 479 Pa. 333, 388 A.2d 683 (1978); *Commonwealth v. Baker,* 466 Pa. 479, 353 A.2d 454 (1976). Where improperly admitted evidence has been allowed to be considered by the jury, its subsequent deletion does not justify a finding of insufficient evidence. The remedy in such a case is the grant of a new trial. *Commonwealth v. Fortune,* 464 Pa. 367, 346 A.2d 783 (1975); *Commonwealth v. Poteet,* 434 Pa. 230, 253 A.2d 246 (1969); *Commonwealth v. Gist,* 433 Pa. 101, 249 A.2d 351 (1969); *Commonwealth v. Pearson,* 427 Pa. 45, 233 A.2d 552 (1967).

In this case the jury returned verdicts of guilt premised upon three acts of murder: the death of Ms. Susan Reinert, and the deaths of her two minor children. We will first assess the evidence in support of a finding that Ms. Reinert was murdered and that appellant participated in that act.

■ The Commonwealth presented evidence to establish that the nude body of Susan Reinert was found in the hatchback trunk compartment of a vehicle that was later discovered to have been owned by the victim. This vehicle was found in the parking lot of a Host Inn situated in Swatara Township, Dauphin County. The macabre discovery was made by a township police officer at approximately 5:20 a.m. on Monday, June 25, 1979. Earlier, at approximately 2:00 a.m., the same officer had observed the vehicle and noticed the hatch was up. At that point he intended to investigate further but was distracted by a radio dispatch requiring him to attend another matter. He subsequently returned to the area in response to an anonymous telephone call made to the Dauphin County police department. Later investigation revealed that the vehicle with the trunk open and an object protruding had been observed on June 24, 1979, at approximately 7:00 p.m.

The clothes of the victim could not be found, nor was there any evidence of the identity of the deceased. The victim was later identified as Susan Reinert, a teacher at the Upper Merion High School, located in Upper Merion Township where appellant herein was formerly the principal. A forensic pathologist determined that Ms. Reinert had sustained massive hemorrhaging in the eye area and abrasions over her body. He also opined that certain prominent bruises on the back of the body of the victim were consistent with the imprint of a chain. The cause of death was determined to be asphyxiation resulting from an overdose of morphine, which was consistent with having been caused by criminal agency. It was the pathologist's opinion that death probably occurred during the morning hours of Sunday, June 24, 1979.

The last persons to see Ms. Reinert alive were a next door neighbor, Ms. Mary Grove and her granddaughter, Beth Ann Brook. These witnesses testified they saw Ms. Reinert and Michael and Karen on Friday, June 22, 1979, at approximately 9:20 p.m. on the porch of the Reinert's home, and shortly thereafter heard the group drive away from the

home in Ms. Reinert's automobile. The granddaughter testified Karen Reinert was wearing a little green pin with a white "P". At the time in question Karen was age eleven and Michael was age ten. The children of Ms. Reinert have not been seen or heard from since. There is no question that Ms. Reinert's death resulted from a criminal agency and the defense does not dispute that point. Thus, the sufficiency of the evidence as to the death by criminal agency of Ms. Reinert was clearly established.

The Commonwealth introduced evidence that, from approximately 1973 until the time of her death, Reinert had been romantically involved with William S. Bradfield, a fellow English teacher at Upper Merion High School.[1] Reinert, believing Bradfield and she were to be married, began arranging her finances in favor of him, such as making him the primary beneficiary of her will and the sole beneficiary of $730,000.00 in life insurance benefits. The victim also had arranged to make Bradfield the guardian of her children in the event of her death. The arrangements were kept secret by Bradfield who told his friends, and his lover, Susan Myers, that Reinert was enamoured of him but that he was not interested in her, all the while promising Reinert he would marry her in the summer of 1979.

Appellant was the principal of the high school where the victim taught. There was no evidence of any relationship other than a professional one between Smith and the victim. The theory of the Commonwealth was that a conspiracy was formed between Smith and Bradfield to share in the monetary reward that would be available to Bradfield upon the untimely demise of Ms. Reinert. An additional reason offered was that Ms. Reinert was killed to assure that she would not disclose that Bradfield had offered perjured testimony on Smith's behalf in an earlier, unrelated theft trial.

1. Bradfield had been convicted on three counts of murder in the first degree for the deaths of Ms. Reinert and her two children prior to the trial in this matter. He was not called as a witness in the trial against Smith.

The earlier theft occurred in a Sears store in the St. David's Mall, Montgomery County [2], in August 1977. It was further established that Bradfield appeared as a witness at the theft trial and offered alibi testimony on Smith's behalf. Between the date of the theft and the trial of that matter in May of 1979, Bradfield and Smith established what the Commonwealth contended was a conspiratorial relationship. The Commonwealth in the instant trial called the witnesses from the theft trial to establish that Smith was indeed in the Sears store at the time of the theft. This evidence was offered to establish that Bradfield's testimony in the former trial was untrue. An agent of the Federal Bureau of Investigation testified that an unsigned, typed letter dated October 1978 (N.T. 4/21/86, Vol. 16, Exhibit 26) discussed a telephone code system as well as proposed alibi testimony for the theft trial. A fingerprint of Smith was found on an envelope which purportedly contained the letter.[3] This evidence was offered to support the Commonwealth's theory that a criminal conspiracy emerged from the effort of Smith to avoid conviction at the theft trial and continued over to the instant murders.

Items of physical evidence were produced by the prosecution in support of its theory of the case. A green pin with a white "P", similar to the one being worn by Karen Reinert when she was last seen alive by the neighbors, was recovered from under the front seat of Jay Smith's car. A hair similar to Susan Reinert's was found inside the home of Smith. Fibers found on Reinert's body during the autopsy similar to those from the carpet in the basement of Smith's home. A comb was discovered under the lifeless body of Ms. Reinert in the rear portion of her vehicle. The comb was imprinted with the numbers and letters "79 USAR-COM." Smith was formerly a member of the 79 USAR-

2. Although the theft occurred in Montgomery County, the trial in that case was held before the Court of Common Pleas in Dauphin County as a result of the grant of a motion for a change of venue (N.T. 4/17/86, Vol. 14 at 2223).

3. It is unclear from the testimony whether the letter was contained at any time in the envelope. Fingerprint analysis performed on the letter revealed no latent prints.

COM, a U.S. military unit. A bag of identical combs was subsequently retrieved from Smith's home. The Commonwealth produced a letter from Smith to his wife requesting that she dispose of the carpet in their home and that she clean the interior of his automobile.[4]

The Commonwealth also presented the testimony of two fellow inmates of appellant during his confinement for the theft charges. This evidence showed that Smith requested one of these fellow prisoners kill the state police detectives investigating this case. Another former fellow prisoner testified that Smith had confessed his complicity in the murders, stating his motives were money and fear that Susan Reinert would reveal the perjured alibi testimony. The former prisoners also testified to escape plans formulated by Smith.

Viewing this evidence in a light most favorable to the prosecution and drawing all reasonable inferences favorable to that side, there was sufficient evidence presented to the jury in this case to establish each of the elements of the charge relating to the death of Ms. Reinert beyond a reasonable doubt.

▇▇▇▇ In assessing the evidence of the death of the two children of Ms. Susan Reinert, we are confronted with the further problem resulting from the fact that their bodies have never been found. In a homicide prosecution, the Commonwealth need not produce the body of the victim, if the *corpus delicti* is established circumstantially. *Commonwealth v. Burns*, 409 Pa. 619, 187 A.2d 552 (1963); *Commonwealth v. Agoston*, 364 Pa. 464, 72 A.2d 575, *cert. denied*, 340 U.S. 844, 71 S.Ct. 9, 95 L.Ed. 619. A presumption of death arises where a person who has been absent from his home for a period of seven years has been neither seen nor heard from during that period. *Groner v. Knights of Maccabees*, 265 Pa. 129, 108 A. 437 (1919);

---

**4.** This letter was written by Smith from prison where he had been incarcerated since June 26, 1979, as a result of the theft charges.

*Maley v. Pennsylvania Railroad Co.*, 258 Pa. 73, 101 A. 911 (1917).[5]

As previously stated, the children were last seen on the evening of June 22, 1979, in the company of their mother. Upon the discovery of the death of the mother, the police conducted a diligent search to ascertain the whereabouts of the children to no avail. The children had a close relationship with both their father and their paternal grandmother. Additionally, it was established that the children knew how to reach both their father and paternal grandmother by telephone and also were aware of where they lived. According to the testimony of both father and the grandmother, neither heard from the children after June 22, 1979. The Commonwealth produced evidence that a nationwide search was initiated by the FBI, which assigned eighteen agents full-time for five months in the investigation to ascertain the whereabouts of these children. These agents were further assisted in the search by each of the fifty-nine FBI field offices throughout the nation. Every lead received during this period was thoroughly investigated. The length of the absence, its unexplained character, the failure of the children to communicate with all known relatives and associates, the nature of the relationship of the children with their family and their dependency upon their family because of their minority all lead to the inevitable conclusion that they shared their mother's fate and are no longer alive. Under these circumstances, the applicability of an inference of their death as a result of criminal agency is appropriate, and the jury could properly infer that those who caused the death of their mother also were responsible for a similar fate of the children.

■ Again, appellant herein raises numerous assignments of trial error in addition to the challenge of the

5. Although the cases cited in support of a presumption of death arose in the context of civil litigation, the factors giving rise to the presumption are equally valid in criminal matters. Whereas in the civil law, these factors would support a presumption, in the criminal law they support a permissible inference. *See e.g., Commonwealth v. DiFrancesco*, 458 Pa. 188, 329 A.2d 204 (1974).

sufficiency of the evidence. After our review of this matter, we are constrained to conclude that appellant's challenge to the admission of the contents of statements allegedly made by Bradfield to various individuals is valid and the admission of the testimony constituted reversible error. Because of our resolution of the matter, we need not consider the remaining assignments of error.[6]

**6.** The other claims of appellant not considered herein are as follows:
(a) Whether the trial court erred in allowing the prosecutor to retry appellant's theft trial during this case;
(b) Whether the trial court erred in admitting testimony that appellant wanted the investigating officers and Bradfield killed where the probative value of the evidence was outweighed by its undue prejudice;
(c) Whether the court improperly admitted plans to escape as evidence of consciousness of guilt;
(d) Whether the court erred in refusing to allow transcripts and video conversations to go out with the jury where those items were misquoted out of context by the prosecutor in his closing;
(e) Whether the court erred in admitting copies of letters seized from appellant mailed to his attorney where such letters were confidential communications;
(f) Whether the trial court erred in denying a motion for a change in venue;
(g) Whether after-discovered evidence and prosecutorial misconduct requires a new trial where the prosecutor had an agreement with one of appellant's former jailmates, in exchange for his testimony, which was not revealed to appellant in violation of the *Brady* rule;
(h) Whether the prosecutor's closing remarks were inflammatory and highly prejudicial where he used evidence of the theft trial as evidence of appellant's guilt;
(i) Whether the prosecutor's closing remarks, accusing a retired state police officer of committing perjury, were so inflammatory and prejudicial as to require a new trial;
(j) Whether a new trial is warranted where the prosecutor introduced evidence which flagrantly violated an on-the-record pre-trial agreement;
(k) Whether the evidence is insufficient as a matter of law to support the finding of any aggravating circumstances;
(*l*) Whether his death sentence should be vacated because it is disproportionate to that received by the co-conspirator who was convicted on the same evidence;
(m) Whether the sentence of death must be vacated where the court refused to instruct the jury that they had an absolute right to arrive at a non-unanimous verdict;
(n) Whether the death sentence must be vacated where the court erred in denying a directed verdict for life imprisonment based on the prosecutor's improper argument that torture could be found as

The evidence in question was provided by several individuals who were close friends or paramours of Bradfield. The testimony related to statements made to them on various occasions by Bradfield concerning the activities of Smith in connection with the murders of Ms. Reinert and her children. The Commonwealth conceded that the contents of the statements were fabrications designed to portray Smith as a vicious, depraved killer in an effort to cast blame upon Smith for these murders. (N.T. 4/10/86, Vol. 9 at 1390–92.)

The first of the witnesses was Vincent Valaitis, a fellow English teacher at Upper Merion High School. This witness was allowed to testify that Bradfield told him in the fall of 1978 that he, Bradfield, volunteered to serve as an alibi witness for Smith during the theft trial. It was subsequently made clear that the testimony that Bradfield was intended to offer on Smith's behalf was untrue. He was permitted to relate a number of conversations on various occasions where Bradfield had described Smith as a dangerous individual who intended to harm a number of individuals, including Reinert. He testified that on one occasion Bradfield told him that Smith "was a screened hitman for the Mafia and wanted to kill a number of people, including Susan Reinert." (N.T. 4/10/86, Vol. 9 at 1401.) He also stated that Smith had given him instructions on how to make a gun silencer. Further, additional statements in this vein attributed to Smith by Bradfield were: he, Smith, "knew how to take an ordinary household item and kill anyone with it"; (N.T. 4/10/86, Vol. 9 at 1407 and 4/15/86, Vol. 12 at 1792) that Smith was able to tape up and

an aggravating circumstance where he asserted Reinert had witnessed the murder of her children, an allegation completely unsupported by evidence;
(o) Whether the court erred in charging the jury during the penalty phase not to consider sympathy in its deliberations;
(p) Whether the death sentences must be vacated where the prosecutor's cross-examination of appellant during the penalty phase denied appellant his right to allocution;
(q) Whether the death penalty is cruel and unusual punishment in violation of the U.S. and Pennsylvania Constitution.

immobilize a person very quickly; and that Smith stated that, "the best time to commit murders would be during holidays." (N.T. 4/10/86, Vol. 9 at 1409 and 4/11/86, Vol. 10 at 1593.) Valaitis was also permitted to testify that Bradfield had urged him, on the weekend of the killings, to join Bradfield on a trip to the New Jersey shore. Susan Myers and Chris Pappas also accompanied Bradfield on this trip. Bradfield told the group that Smith was going to kill Ms. Reinert during that weekend and their presence with him (Bradfield) would serve to provide an alibi. On that occasion, the witnesses quoted Bradfield as saying, "I'm afraid this is it. I'm afraid this is the night that Jay C. Smith is going to kill Susan Reinert. I followed him. He circled her house 14 times, and I lost him in a hailstorm...." (N.T. 4/10/86, Vol. 9 at 1416.) Upon their return from their trip, Bradfield went to his apartment, made a telephone call, returned and stated to the witness, "Jay C. Smith's in jail. Smith's in jail. Thank God Smith's in jail. I saved that f——g woman's life,...." (N.T. 4/10/86, Vol. 9 at 1416.)

Previously Bradfield had called upon this witness to travel out of the area with him to establish an alibi for that time period. This occurred during the Christmas holidays in 1978. At that time Bradfield told this witness that it was his (Bradfield's) belief that Smith intended to kill Susan Reinert. On that occasion, the witness, Bradfield, and Susan Myers had travelled to Florida for the express purpose of providing an alibi for Bradfield in the event that Smith did carry out his alleged threat to kill Reinert at that time. (N.T. 4/10/86, Vol. 9 at 1408-9.)

The testimony of the other witnesses was similar in content and character. In each instance the information was supplied to the individuals by Bradfield, and in each case it related to the purported actions of Smith. For instance, Mr. Olsen, who is alleged to have met Bradfield in New Mexico on June 26, 1979, the day after the discovery of Ms. Reinert's body, was permitted to discuss the conversation that occurred between him and Bradfield on that occa-

sion.  On that occasion, in response to the prosecutor's inquiry as to what Bradfield had said to him, the witness was permitted to state: "... I'll quote him [Bradfield], he said, Smith killed that g— d— woman" (N.T. 4/14/86, Vol. 11 at 1742).  Susan Myers, an admitted lover of Bradfield, was permitted to testify that Bradfield told her that Smith had committed thefts and had committed other murders, that "Dr. Smith intended to kill Susan Reinert" and that Dr. Smith "tended to kill on holidays" (N.T. 4/11/86, Vol. 12 at 1593).  Wendy Zeigler, who was characterized as enamored of Bradfield, testified that Bradfield told her that Smith was "mentally unstable", that he intended to kill Susan Reinert, and that he had a list of people to dispatch (N.T. 4/14/86, Vol. 11 at 1690).  Chris Pappas was permitted to testify that Bradfield told him that Smith was under investigation for several crimes and that he "wanted to kill the judge, the people leading the investigation and people who were remotely associated with the investigation" (N.T. 4/15/86, Vol. 12 at 1785).  Finally, Pappas testified that, after Bradfield received a call advising him of the murder of Susan Reinert, he stated, "... apparently Jay Smith had gone through with his threats and had killed her" (N.T. 4/15/86, Vol. 12 at 1833).

In the trial of this case Bradfield was not called upon to testify, nor did the appellant testify on his own behalf.  It is well settled in our law that hearsay evidence is inadmissible unless it qualifies under one of the recognized exceptions to that rule.  5 Wigmore, *Evidence* § 1420 *et seq.* (Chadbourn Rev.1974); McCormick, *Evidence*, § 249 (2d ed. 1972).  The above described statements, wherein third parties were permitted to relate to the jury declarations of Bradfield purporting to represent statements made by Smith and his observations of Smith's state of mind, if offered for the truth of their content, are clearly hearsay.  *United States v. Durant*, 730 F.2d 1180 (8th Cir.) *cert. denied,* 469 U.S. 843, 105 S.Ct. 149, 83 L.Ed.2d 87 (1984); *United States v. Reynolds*, 715 F.2d 99 (3d Cir.1983); *United States v. Fox*, 613 F.2d 99 (5th Cir.1980); *United States v. Williams*, 616

592

F.2d 759 (5th Cir.), *cert. denied*, 449 U.S. 857, 101 S.Ct. 156, 66 L.Ed.2d 72 (1980); *Pauling v. News Syndicate Co.*, 335 F.2d 659 (2d Cir.1964) *cert. denied*, 379 U.S. 968, 85 S.Ct. 662, 13 L.Ed.2d 561 (1965); *Commonwealth v. Griffin*, 511 Pa. 553, 515 A.2d 865 (1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987); *Commonwealth v. Sampson*, 454 Pa. 215, 311 A.2d 624 (1973); *Commonwealth v. Glover*, 446 Pa. 492, 286 A.2d 349 (1972); *Commonwealth v. Jacobs*, 445 Pa. 364, 284 A.2d 717 (1971) *cert. denied*, 409 U.S. 856, 93 S.Ct. 135, 34 L.Ed.2d 100 (1972); *see also, Petition of Earle*, 355 Mich. 596, 95 N.W.2d 833 (1959); *Mash v. Missouri Pacific Railroad Co.*, 341 S.W.2d 822 (Mo.1960); *Ellsworth v. Watkins*, 101 N.H. 51, 132 A.2d 136 (1957); *Wilson v. Hartford Accident & Indemnity Co.*, 272 N.C. 183, 158 S.E.2d 1 (1967); *Auseth v. Farmers Mutual Automobile Insurance Co.*, 8 Wis.2d 627, 99 N.W.2d 700 (1959). The admission of hearsay evidence would constitute error, *United States v. Reynolds, supra; United States v. Blair*, 456 F.2d 514 (3d Cir.1972); *Commonwealth v. Peterkin*, 511 Pa. 299, 513 A.2d 373 (1986), *cert. denied*, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987); *Commonwealth v. Bridge*, 495 Pa. 568, 435 A.2d 151 (1981); *Commonwealth v. Baez*, 494 Pa. 388, 431 A.2d 909 (1981); *Commonwealth v. Thornton*, 494 Pa. 260, 431 A.2d 248 (1981), unless it is established that the error was harmless. *Commonwealth v. Floyd*, 506 Pa. 85, 484 A.2d 365 (1984); *Commonwealth v. Turner*, 499 Pa. 579, 454 A.2d 537 (1982); *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978); *Commonwealth v. Pearson*, 427 Pa. 45, 233 A.2d 552 (1967). If the error is not harmless beyond a reasonable doubt, we are required to reverse the judgment and to award a new trial. *See Turner, supra; Commonwealth v. Baez, supra; Story, supra; Commonwealth v. Linde*, 448 Pa. 230, 293 A.2d 62, *cert. dismissed*, 409 U.S. 1031, 93 S.Ct. 523, 34 L.Ed.2d 482 (1972).

The predicate supporting the rejection of hearsay evidence is its assumed unreliability because the declarant from which the statement originates is not before the

trier of fact and therefore cannot be challenged as to the accuracy of the information sought to be conveyed. *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *Stidum v. Trickey*, 881 F.2d 582 (8th Cir.1989); *Martinez v. Sullivan*, 881 F.2d 921 (10th Cir.1989); *United States v. Koskerides*, 877 F.2d 1129 (2d Cir.1989); *United States v. Bentley*, 875 F.2d 1114 (5th Cir.1989); *Commonwealth v. Galloway*, 476 Pa. 332, 382 A.2d 1196 (1978); *Commonwealth v. Porter*, 449 Pa. 153, 295 A.2d 311 (1972); *Commonwealth v. Ransom*, 446 Pa. 457, 288 A.2d 762 (1972). It also offends an essential concept of this nation that an accused has a fundamental right to confront his accuser. *Dutton v. Evans, supra; Commonwealth v. Galloway, supra; Ransom, supra.*

The dilemma that faces the Commonwealth is that, having conceded the unreliability of the utterances, it has foreclosed the possibility of justifying the admission of the utterances under an exception to the hearsay rule. The exceptions to the hearsay rule are premised upon circumstances surrounding the making of the utterances which would assure the reliability of the contents. Thus, having conceded the unreliability of the utterances, there can be no basis for an exception to the general rule prohibiting hearsay evidence.[7]

The Commonwealth attempts to avoid the hearsay quality of its evidence by asserting that the testimony was not being offered for the truth of its content. The hearsay concern is not present where statements of an out-of-court declarant are not being offered for the truth of the content of those statements. For instance, a witness may testify to a statement made to him when the purpose of its introduction is the fact that the statement was, in fact, made,

7. The "rule" arises in the exclusion of evidence which is not "first hand" but possesses the indicia of reliability that would justify its consideration. It is to accommodate this legitimate concern that we have created exceptions to the hearsay rule. Those exceptions have been carefully defined and should not be expanded solely to justify a conviction.

*Commonwealth v. Sampson,* 454 Pa. 215, 311 A.2d 624 (1973); *Commonwealth v. Jacobs,* 445 Pa. 364, 284 A.2d 717 (1971), *cert. denied,* 409 U.S. 856, 93 S.Ct. 135, 34 L.Ed.2d 100 (1972); *Commonwealth v. Ricci,* 332 Pa. 540, 3 A.2d 404 (1939). Similarly, we have recognized that out-of-court statements which are offered to prove the declarant's state of mind are not within the interdiction of the hearsay rule, *Commonwealth v. Jermyn,* 516 Pa. 460, 533 A.2d 74 (1987); *Commonwealth v. Murphy,* 493 Pa. 35, 425 A.2d 352 (1981); *Commonwealth v. Wright,* 455 Pa. 480, 317 A.2d 271 (1974); *Commonwealth v. Santos,* 275 Pa. 515, 119 A. 596 (1923).

In this instance the Commonwealth argues the testimonial value of these statements was the effect they had upon the listeners. *See Commonwealth v. Dehart,* 512 Pa. 235, 516 A.2d 656, *cert. denied,* 483 U.S. 1010, 107 S.Ct. 3241, 97 L.Ed.2d 746 (1987); *Commonwealth v. Cruz,* 489 Pa. 559, 414 A.2d 1032 (1980); *Commonwealth v. Ricci, supra.* The key to the admission of evidence for this purpose is that no assertive or testimonial use is sought to be made of the content of the utterances. *Commonwealth v. Dehart,* at 254, 516 A.2d at 666; *Commonwealth v. Cruz, supra; Commonwealth v. Ricci, supra.* The difficulty with this theory in the instant appeal is relevancy. The test for relevancy is whether the proffered evidence tends to make a material fact more or less probable. *Martin v. Soblotney,* 502 Pa. 418, 422, 466 A.2d 1022, 1024 (1983); *Commonwealth v. Brown,* 489 Pa. 285, 414 A.2d 70 (1980); *Commonwealth v. Chism,* 480 Pa. 233, 389 A.2d 1041 (1978); J. McCormick, *Evidence* § 185 (2d ed. 1972). Fed.R.Evid. 401.

The motives for the actions of the associates Bradfield had no bearing upon the guilt of Smith. These witnesses had no relationship with Smith. As defense counsel repeatedly noted during trial, these witnesses had no personal knowledge of any association between Smith and Bradfield, and they certainly had no personal knowledge of a conspir-

acy between the two to kill the Reinerts. Therefore, their motives for responding to the various requests of Bradfield were totally unrelated to the material issue for the motives shed no light upon any complicity of Smith.

■ An equally serious flaw in the theory of the Commonwealth to justify this evidence is its reliance upon speculation as to Bradfield's motive in conveying false information. The Commonwealth contends that these statements were made by Bradfield in furtherance of the conspiratorial design between Bradfield and Smith to dispatch the Reinerts. While proof of the deliberate duplicity of Bradfield would be relevant in a trial against him, *Commonwealth v. Boyle*, 498 Pa. 486, 447 A.2d 250 (1982); *Commonwealth v. Kravitz*, 400 Pa. 198, 161 A.2d 861 (1960), *cert. denied*, 365 U.S. 846, 81 S.Ct. 807, 5 L.Ed.2d 811 (1961); *Commonwealth v. Sauders*, 390 Pa. 379, 134 A.2d 890 (1957), it cannot, standing alone, be used against Smith. There must be independent evidence to establish that Bradfield's motive for making these false statements was indeed for the purpose of furthering the aims of the alleged conspiracy between Bradfield and Smith. *United States v. Gibbs*, 739 F.2d 838 (3d Cir.1984), *cert. denied*, 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985); *United States v. Jannotti*, 729 F.2d 213 (3d Cir.1984), *cert. denied*, 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984); *United States v. Ammar*, 714 F.2d 238 (3d Cir.), *cert. denied, sub nom., Stillman v. U.S.*, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); *United States v. Frumento*, 426 F.Supp. 797 (E.D.Pa.1976), *aff'd*, 552 F.2d 534, *aff'd*, 563 F.2d 1083 (3d Cir.1977), *cert. denied, sub nom., Millhouse v. United States*, 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 and, *cert. denied, sub nom., Sills v. United States*, 434 U.S. 1072, 98 S.Ct. 1258, 55 L.Ed.2d 776 (1978); *Commonwealth v. Dreibelbis*, 493 Pa. 466, 426 A.2d 1111 (1981); *Commonwealth v. Coccioletti*, 493 Pa. 103, 425 A.2d 387 (1981); *Commonwealth v. Garcia*, 478 Pa. 406, 387 A.2d 46 (1978);

*Commonwealth v. Holloway,* 429 Pa. 344, 240 A.2d 532 (1968). Absent such proof, this evidence cannot be employed to reflect upon the guilt of the instant appellant. *United States v. Gibbs, supra; United States v. Jannotti, supra; United States v. Ammar, supra; Stillman v. United States, supra; United States v. Continental Group, Inc.,* 603 F.2d 444 (3d Cir.1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980); *United States v. Schoenhut,* 576 F.2d 1010 (3d Cir.), *cert. denied,* 439 U.S. 964, 99 S.Ct. 450, 58 L.Ed.2d 421 (1978); *Commonwealth v. Pinkins,* 514 Pa. 418, 525 A.2d 1189, *cert. denied,* 484 U.S. 867, 108 S.Ct. 192, 98 L.Ed.2d 144 (1987); *Dreibelbis, supra; Garcia, supra; Commonwealth v. Petrillo,* 338 Pa. 65, 12 A.2d 317 (1940).

■■■ Whether or not there is evidence that strongly suggests a finding of guilt, it is the responsibility of the Commonwealth to prove that conduct by legally sufficient evidence. Lest we, as a society, be accused of being barbaric, we must objectively test compliance with our standards before imposing such a penalty. Regardless of personal predelictions, the law must strictly adhere to these fundamental precepts in the decision-making process.

For the foregoing reasons, we are constrained to conclude that the convictions must be reversed and the cause remanded for a new trial.[8]

8. On January 19, 1989, this Court ordered the Court of Common Pleas of Dauphin County to conduct an evidentiary hearing regarding certain evidence in the Commonwealth's possession, which may have been exculpatory in nature, but which was never disclosed to the defense. The evidence in question was a "rubber lifter", an evidence collection device, which allegedly contained grains of sand found on Mrs. Reinert's feet during the autopsy. Appellant argued that this evidence was significant to his defense in that it would have supported his theory that Mrs. Reinert was killed at the seashore by Bradfield and his associates.

In view of our disposition, we need not consider this issue in determining whether a new trial should be granted. This evidence will now be available at a subsequent trial, and the jury will be given the opportunity to assess its import within the totality of the evidence presented.