J-A30018-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| DAVID L. ALBRIGHT JR., | |
| Appellant | No. 360 MDA 2016 |

Appeal from the Judgment of Sentence of October 14, 2015
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s): CP-22-CR-0003573-2014

BEFORE:  BOWES, OLSON and STABILE, JJ.

MEMORANDUM BY OLSON, J.:                     **FILED FEBRUARY 14, 2017**

Appellant, David L. Albright, Jr., appeals from the judgment of sentence entered on October 14, 2015, as made final by the denial of Appellant's post-sentence motion on February 4, 2016.  We affirm.

The trial court provided us with an able and well-written summary of the underlying facts of this case.  As the trial court explained:

> [Appellant] was originally charged with aggravated assault, criminal solicitation to commit aggravated assault, terroristic threats, ethnic intimidation, stalking, simple assault, recklessly endangering another person, disorderly conduct[,] and public drunkenness for an incident that occurred in June 2014.  The aggravated assault charge was dropped, and [the trial] court dismissed the stalking and recklessly endangering another person charges.  A [jury] trial was held [in August] 2015 [and, during this trial, the following evidence was presented]. . . .
>
> From 2007 to December 2013, [Appellant] was employed by Vistar[,] where he was supervised by [K.L.]

[Appellant] was terminated in December 2013 following a dispute with another employee and in March of 2014 [Appellant] made a few unsuccessful attempts *via* text message to [K.L.] to get his job back. At some point, [K.L.] received notice that [Appellant] may have a weapon [and] intended to harm him.

In June of 2014, [K.L.] was at his home late [Father's Day] night with his fiancée and son. At approximately 9:00 p.m.[, K.L.] heard pounding on his front door. As he approached the door, he turned on the light and saw the person at the door move off to the side of the door, but continue knocking with the back of his fist. [K.L.] then went to the front door and saw [Appellant] there. [Appellant] indicated he was there to discuss the job he had lost, but [K.L.] said "David, I have nothing to say to you. Just leave." [Appellant] demanded that [K.L.] come out and talk to him man to man but [K.L.] refused as he was afraid [Appellant] had a weapon and was there to hurt him. [Appellant] did not attempt to break into the apartment or enter it. . . .

After [K.L.] told [Appellant] several times to leave, [Appellant] said "that was seven years of my life" in reference to his time at Vistar. [K.L.] replied "you dug your own grave over at work." [Appellant] then replied "what about your grave[, K.L.], let's talk about your grave." [K.L.] interpreted this as a threat and told his fiancée to call the police. Ultimately, [K.L.] himself called the police and [Appellant] left. [K.L.] believe[d Appellant] must have heard him on the phone with the police.

Officer Wade Bloom arrived at [K.L.'s] apartment to speak to [K.L.]. He left the house to try to find [Appellant], but was unable to do so and returned. He then received a call from the dispatcher that there was a man a couple of blocks away at a different apartment building "wielding a knife and causing a disturbance."

At Willow Garden apartments, Dwayne Davis was sitting in the courtyard outside of his apartment [with] his fiancée and their friend. Davis noticed [Appellant] approaching straight toward their group. [Appellant] introduced himself, asked if he could sit down and engaged in small talk. After

- 2 -

a bit of talk, [Appellant] told the group he was "on a mission to kill" and when asked who, he replied "my boss." [Appellant] then pulled a knife out of his pants, and asked Davis if he would do it. [Davis] took this seriously and believed that [Appellant] had just asked him to use the knife to kill his boss. Apparently not everyone at the table heard this comment. Davis said no and then walked over to his neighbor, Tracey Strickland, to ask her to call the police because he thought they needed to be involved. Tracey called the police and Officer Bloom arrived.

Officer Bloom drew his weapon and slowly entered the courtyard as he was uncertain of the suspect's location. Davis pointed Bloom toward [Appellant] and Bloom approached with his firearm drawn[. He] identified [Appellant] and aimed his gun. Officer Bloom ordered [Appellant] to drop to his knees and asked where the weapon was. [Appellant] refused to drop to his knees and denied having a weapon. Bloom got closer, holstered his firearm and switched to his [TASER]. [Appellant] then cooperated by dropping to his knees, though he still denied having a knife. Bloom handcuffed [Appellant] and then found the knife approximately [six to eight] feet away.

Trial Court Opinion, 2/4/16, at 1-4 (internal citations omitted) (some internal capitalization omitted).

The jury found Appellant guilty of criminal solicitation to commit aggravated assault, terroristic threats, and disorderly conduct[1] and, on October 14, 2015, the trial court sentenced Appellant to serve an aggregate term of six-and-a-half to 13 years in prison for his convictions.

---

[1] 18 Pa.C.S.A. §§ 902, 2706(a)(1), and 5503(a)(4), respectively.

The trial court denied Appellant's post-sentence motion on February 4, 2016 and Appellant filed a timely notice of appeal. Appellant raises three claims on appeal:

> [1.] Was not the evidence insufficient to establish the offense of solicitation to commit aggravated assault when the Commonwealth did not prove that [Appellant] requested another person to "engage in specific conduct" within the meaning of 18 [Pa.C.S.A.] § 902?
>
> [2.] Did not the [trial] court err in overruling [Appellant's] objection to the admission of certain out-of-court statements during the testimony of the complainant when such statements constituted hearsay not subject to any exception and when there was no relevant non-hearsay basis for their admission?
>
> [3.] Did not the [trial] court err in denying [Appellant's] objection to presentation of anti-character evidence during rebuttal from a professional investigative witness hired by the corporate employer of the complainant when [Appellant] did not open the door to such evidence and when such evidence exceeded the bounds of proper anti-character evidence under Pa.R.E. 404(a)(2)(A) and 405?

Appellant's Brief at 6 (some internal capitalization omitted).

We have reviewed the briefs of the parties, the relevant law, the certified record, the notes of testimony, and the opinions of the able trial court judge, the Honorable Deborah E. Curcillo. We conclude that there has been no error in this case and that Judge Curcillo's opinions, entered on February 4, 2016 and April 18, 2016, meticulously and accurately dispose of Appellant's issues on appeal. Therefore, we affirm on the basis of Judge Curcillo's opinions and adopt them as our own. In any future filings with this

or any other court addressing this ruling, the filing party shall attach a copy of the trial court opinions with the victim's name redacted.

Judgment of sentence affirmed. Jurisdiction relinquished.

Bowes, J. joins this memorandum.

Stabile, J. concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/14/2017

APR 19 2016

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS,
: DAUPHIN COUNTY, PENNSYLVANIA
:
v. : 360 MDA 2016
: 3573 CR 2014
:
DAVID ALBRIGHT : CRIMINAL MATTER

## TRIAL COURT MEMORANDUM OPINION PURSUANT TO PENNSYLVANIA RULE OF APPELLATE PROCEDURE 1925(a)

Presently before the Superior Court of Pennsylvania is the appeal of David Albright (hereinafter "Appellant") from the judgment of sentence entered by this Court following a jury trial.

### Procedural History

Appellant was originally charged with aggravated assault, criminal solicitation to commit aggravated assault, terroristic threats, ethnic intimidation, stalking, simple assault, recklessly endangering another person, disorderly conduct and public drunkenness for an incident that occurred in June 2014. The aggravated assault charge was dropped, and this Court dismissed the stalking and recklessly endangering another person charges. A trial was held August 19, 2015. Appellant was found guilty of criminal solicitation, terroristic threats and disorderly conduct. He was found not guilty of ethnic intimidation and simple assault. The Court found him not guilty of public drunkenness. Sentencing was deferred to October 14, 2015, at which time he was sentenced to 5 ½ to 11 years in a state correctional institute for the solicitation to commit aggravated assault charge and a consecutive 1-2 years in a state correctional institute for the terroristic threats charge.

A post sentence motion was filed on October 23, 2015, and this Court ordered briefs on the matter. The parties filed timely briefs. This Court denied the post sentence motion on

February 4, 2016. On March 1, 2016, we received a Notice of Appeal from the appellant and on March 2, 2016, we ordered a statement of matters complained of on appeal. The appellant provided a timely statement on March 21, 2016.

## Factual Background

The factual background was addressed in our order and opinion denying the Post Sentence Motion filed February 4, 2016. We adopt it in full here.

## Appellant's Statement of Matters Complained of on Appeal

- The evidence was insufficient to sustain a conviction for the offense of criminal solicitation to commit aggravated assault.

- The Court erred in overruling Defendant's objection to admission of certain out-of-court statements during the direct examination of' k. L· __, the complaining witness.

- The Court erred in denying Defendant's objection to the Commonwealth's introduction of rebuttal testimony though a witness named Andrew Katerman.

## Discussion

The insufficiency of the evidence claim was addressed in our Post Sentence Motion Order and Memorandum Opinion. We adopt that reasoning in full here.

Appellant also contends that this Court erred in overruling his objection to "certain out-of-court statements during the direct examination of __k L· __..." Specifically, appellant indicates that 'k.L testified on direct examination that he "had knowledge [that Appellant] may have a weapon and that he may intend to do harm to me." (Notes of Testimony, Jury Trial, p. 33).

> The term "hearsay" is defined as an out-of-court statement, which is offered in evidence to prove the truth of the matter asserted. *Commonwealth v. Ramtahal,* —— Pa. ——, 33 A.3d 602, 610 (2011); Pa.R.E. 801(c). Hearsay statements are generally inadmissible unless they fall under an enumerated exception. Pa.R.E. 802. An out-of-court statement is not hearsay when it has a

2

> purpose other than to convince the fact finder of the truth of the statement.

Com. v. Busanet, 618 Pa. 1, 56, 54 A.3d 35, 68 (2012).

> However, where the statement is being offered to show its effect on a listener, it is not being offered for the truth of the matter and is non-hearsay. *See Commonwealth v. DeHart*, 512 Pa. 235, 516 A.2d 656, 666 (1986) ("an out-of-court statement offered to explain a course of conduct is not hearsay."); *Commonwealth v. Smith*, 523 Pa. 577, 568 A.2d 600, 609 (1989); *Gunter v. Constitution State Service Co.*, 432 Pa.Super. 295, 638 A.2d 233, 235 (1994); *Commonwealth v. Blough*, 369 Pa.Super. 230, 535 A.2d 134, 138 n. 11 (1987) (citing McCormick, Evidence § 249, which provides that statements introduced to show the effect on a listener are not hearsay).

Schmalz v. Manufacturers & Traders Trust Co., 2013 PA Super 52, 67 A.3d 800, 803 (2013) (n. 3)

Defense counsel immediately objected and at the time the objection was made, the Commonwealth argued that the statement regarding к.ᴄ.'s knowledge was merely to show its effect on к.ᴄ. and why he acted as he did in not letting appellant in the house and calling the police and not offered for the truth of the matter asserted. We agreed with that argument and the statement that he had knowledge that regarding Appellant's possible acquisition of a weapon was permitted. Defense counsel asked for a limiting instruction which would limit any information regarding what к.ᴄ. knew from a third party to only go towards his state of mind and not the terroristic threats charge. The Court agreed to this.

The next day however, the matter of how к.ᴄ. acquired this knowledge was brought out on cross-examination by defense counsel. In particular, defense counsel specifically asked к.ᴄ. if he had received an email conveying that information. Defense counsel went on to ask whether the author of that email heard it him or herself or if they heard it from another person. ] к.ᴄ. answered that he had received an email and that the author of the email had heard it from someone else. (N.T. 72-73).

Quite frankly, we have a hard time accepting this as error when (1) the objection was made at the time the Commonwealth introduced evidence that Kelly had knowledge of a possible threat and used it merely to show its effect on him and why he reacted as he did that evening (2) the Court agreed to a limiting instruction and, most importantly, (3) defense counsel questioned the witness on how he acquired that knowledge. Defense counsel opened the door to that testimony and neither this Court nor the Commonwealth have any duty to do defense counsel's job.

Appellant's third issue is in regard to the testimony of Andrew Katerman. Specifically, appellant contends that he did not put his character in issue and the actual testimony Katerman provided was not confined to statements of reputation as required, but rather contained specific instances of conduct in violation of Pa.R.E. 404.

However, Pa.R.E. 404(2)(A) reads: "Exceptions for a Defendant or Victim in a Criminal Case. The following exceptions apply in a criminal case: a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it[.]"

Katerman is a private investigator who was hired by Vistar to investigate into defendant's reputation at work following his separation from employment. (N.T. 269). On direct examination of Katerman, the following exchange between Katerman and the prosecutor took place:

> Q Now did you also ask about his reputation for – he's accused of violence in this case. Have you asked about his reputation for violent behavior?
> A Yes, I did.
> Q And what did you learn about that?
> A That he had threatened some employees previously.
> Mr. Roberts: Objection, Your Honor. It's got to be limited to reputation.
> The Witness: Okay.
> Mr. Roberts: That's a specific occurrence. He can't testify to that.

The Court: Well, he opened the door as to not having a violent nature, so I will allow it. (N.T. 271-272).

Appellant had taken the stand in his own defense. On direct examination, appellant testified "I don't try to threaten people. I have no history of violence with people." (N.T. 249). By making that statement, appellant opened the door as to his character with regards to violence and the prosecutor is permitted to offer evidence to rebut it. In this case, the prosecutor did call a rebuttal witness.

For these reasons, we ask the Superior Court to uphold and affirm our judgment of sentence entered by this Court following a jury trial.

Respectfully submitted:

Deborah E. Curcillo, Judge

Dated: 4/18/16

5

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS,
: DAUPHIN COUNTY, PENNSYLVANIA
:
v. : NO. 3573 CR 2014
:
DAVID ALBRIGHT : CRIMINAL MATTER

## POST SENTENCE MOTION ORDER AND MEMORANDUM OPINION

AND NOW, this 4th day of February, 2016, upon consideration of the Post Sentence Motion filed by David Albright (hereinafter "Defendant") it is HEREBY ORDERED that the Motion is DENIED.

Defendant is hereby notified of the right to appeal this order within 30 days of the date of this order. Defendant is entitled to the assistance of counsel in preparation of the appeal. If Defendant cannot afford counsel, Defendant has the right to proceed *in forma pauperis* and proceed with assigned counsel. Pa.R.Crim.P. 720.

Defendant was originally charged with aggravated assault, criminal solicitation to commit aggravated assault, terroristic threats, ethnic intimidation, stalking, simple assault, recklessly endangering another person, disorderly conduct and public drunkenness for an incident that occurred in June 2014. The aggravated assault charge was dropped, and this Court dismissed the stalking and recklessly endangering another person charges. A trial was held August 19, 2014. Defendant was found guilty of criminal solicitation, terroristic threats and disorderly conduct. He was found not guilty of ethnic intimidation and simple assault. The Court found him not guilty of public drunkenness. He was sentenced to 5 ½ to 11 years in a state correctional institute for the

solicitation to commit aggravated assault charge and a consecutive 1-2 years in a state correctional institute for the terroristic threats charge.

From 2007 to December 2013, Defendant was employed by Vistar where he was supervised by K.L. (the victim.). (Notes of Testimony, 8/19-8/20-2015, p. 23-24).

He was terminated in December 2013 following a dispute with another employee and in March of 2014 he made a few unsuccessful attempts via text message to K.L. to get his job back. (N.T. 25-31). At some point, K.L. received notice that Defendant may have had a weapon ad intended to harm him. (N.T. 33).

In June of 2014, K.L. was at his home late father's Day night with his fiancée and son. At approximately 9:00 p.m. he heard pounding on his front door. (N.T. 34). As he approached the door, he turned on the light and saw the person at the door move off to the side of the door, but continue knocking with the back of his fist. (N.T. 37) He then went to the front door and saw Defendant there. (N.T. 38). Defendant indicated he was there to discuss the job he had lost, but I K.L. said "David, I have nothing to say to you. Just leave." (N.T. 38). Defendant demanded that I K.L. come out and talk to him man to man but K.L. refused as he was afraid Defendant had a weapon and was there to hurt him. (N.T. 39-40). Defendant did not attempt to break into the apartment or enter it. After K.L. told Defendant several times to leave, Defendant said "that was seven years of my life" in reference to his time at Vistar. (N.T. 40). K.L. replied "you dug your own grave over at work." (N.T. 40). Defendant then replied "what about your grave K.L. t, let's talk about your grave." (N.T. 41). K.L. interpreted this as a threat and told his fiancée to call

2

the police. (N.T. 41). Ultimately, ℳ℃ himself called the police and Defendant left. ℳ℃ believes Defendant must have heard him on the phone with the police. (N.T. 41-42).

Officer Wade Bloom arrived at ℳ℃'s apartment to speak to ℳ℃. 9N.T. 50-51). He left the house to try to find Defendant, but was unable to do so and retuned. (N.T. 51). He then received a call from the dispatcher that there was a man a couple of blocks away at a different apartment building "wielding a knife and causing a disturbance." (N.T. 200).

At Willow Garden apartments, Dwayne Davis was sitting in the courtyard outside of his apartment which his fiancée and their friend. (N.T. 770. Davis noticed Defendant approaching straight toward their group. (N.T. 83). Defendant introduced himself, asked if he could sit down and engaged in small talk. (N.T. 84-85). After a bit of talk, Defendant told the group he was "on a mission to kill" and when asked who, he replied "my boss." (N.T. 85). Defendant then pulled a knife out of his pants, and asked Davis if he would do it. (N.T. 85). David took this seriously and believed that Defendant had just asked him to use the knife to kill his boss. (N.T. 87). Apparently not everyone at the table heard this comment. Davis said no and then walked over to his neighbor, Tracey Strickland, to ask her to call the police because he thought they needed to be involved. (N.T. 87). Tracey called the police and Officer Bloom arrived. (N.T. 166-167).

Officer Bloom drew his weapon and slowly entered the courtyard as he was uncertain of the suspect's location (N.T. 203). Davis pointed Bloom towards Defendant and Bloom approached with his firearm drawn law — he identified Defendant, and aimed his gun. (N.T. 205-206). Officer Bloom ordered Defendant to drop to his knees and asked

where the weapon was. (N.T. 206). Defendant refused to drop to his knees and denied having a weapon. Id. Bloom got closer, holstered his firearm and switched to his taser. (N.T. 207-209). Defendant then cooperated by dropping to his knees, though he still denied having a knife. (N.T. 209). Bloom handcuffed Defendant and then found the knife approximately 6-8 feet away. (N.T. 210).

Defendant contends that the evidence was insufficient to sustain a conviction for criminal solicitation.

In an insufficiency of the evidence claim, the standard applied is, whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact finder to find every element of the crime beyond a reasonable doubt. "In applying the above test, we may not weigh the evidence and substitute our judgment for the fact finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude very possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proof by proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part, or none of the evidence." Commonwealth v. DiStefano, 782 A.2d 574, 582 (Pa. Super. 2001).

4

According to 18 Pa.C.S.A. § 902(a), a person is guilty of solicitation to commit a crime if, with the intent of promoting or facilitating its commission, he commands, encourages, or requests another person to engage in specific conduct which would constitute the crime or an attempt to commit the crime, or which would establish his complicity in its commission or attempted commission.

Defendant contends that he provided no specific details, requested no specific conduct, nor offered any money or factors in exchange for acquiescing in his request. He merely made a comment without any details. He never specified who he wanted to kill or who he wanted Davis to kill – he merely said "boss" and Davis had no knowledge of who his boss was or where he lived or how he was supposed to kill him.

However, at trial, the evidence produced and apparently believed by the jury based upon their verdict, was that Defendant had just left his former boss's home and went to another location where he pulled out a knife and asked a stranger to kill his boss. Davis, a stranger, testified that he interpreted the interaction as a request to kill the boss using the knife. Davis cut the interaction short by saying no, thus no other information regarding the boss's name or whereabouts was exchanged. We acknowledge that no name was given, but common sense tells us that Defendant's identifying of his boss was identifying a specific person that Defendant was asking to be killed.

A claim that a verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict. Commonwealth v. Widmer, 744 A.2d 745, 751 (Pa. Super. 2000). A verdict is against the weight of the evidence only when it is so contrary to the evidence as to shock one's sense of justice. Commonwealth v. Cousar,

928 A.2d 1023, 1036 (Pa. Super. 2007). A new trial should not be granted merely because of a conflict in testimony or because the court on the same facts would have arrived at a different conclusion, Widmer, at 752. In this claim, the trial Court must "assess the credibility of the testimony offered by the Commonwealth." Commonwealth v. Marks, 704 A.2d 1095, 1098 (Pa. Super. 1997).

Defendant contends that the verdict of guilty on the criminal solicitation charge was against the weight of the evidence. Again, his contention is that he did not request any specific conduct at the time he spoke about his boss – no specific name, place time or favors were asked. We reiterate our analysis under sufficiency of the evidence – Defendant identified his boss as someone he wanted killed while he pulled out a knife as he spoke to a small group of people. Our sense of justice is not shocked that he was convicted of criminal solicitation under these circumstances. He clearly intended to

Defendant contends that the verdict was against the weight of the evidence on the terroristic threats charge. Per 18 Pa.C.S.A. § 2706(a)(1), a person commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to commit any crime of violence with intent to terrorize another.

The purpose of a law against terroristic threats "is to impose criminal liability on persons who make threats which seriously impair personal security....it is not intended by this section to penalize mere spur-of-the-moment threats which result from anger." Commonwealth v. Anneski, 525 A.2d 373, 374 (Pa. Super. 1987). However a situation which give the defendant time for reflection about what he intends to say can be characterized as deliberate and premeditated rather than spur-of-the-moment.

Commonwealth v. Gordon, No. 1452 WDA 2014, 2015 WL 6954379, at *4 (Pa. Super. Ct. Nov. 9, 2015). However, being angry does not render a person incapable of forming the intent to terrorize. In re J.H., 797 A.2d 260 (Pa. Super. 2002). We must look at the circumstances surrounding the statement to determine whether it is a terroristic threat. Commonwealth v. Griffin, 456 A.2d 171, 174 (Pa. Super. 1983).

The circumstances surrounding the threat made to K.L. are as follows. About six months after being terminated by Vistar, Defendant appeared at K.L.'s home at about 9:00 pm. He knocked or pounded on K.L.'s door in order to get K.L. to talk to him about his termination. Defendant refused to leave even though K.L. would not open the door and refused to discuss it with him. After K.L. finally said "you dug your own grave over at work" Defendant then said "what about your grave K.L., let's talk about your grave." K.L. immediately felt threatened and instructed his fiancée to call the police.

Unlike the Anneski case cited by Defendant, there was not an on-going argument here. In fact, K.L. had been ignoring Defendant's text message for the last six months. He also refused to engage with Defendant when Defendant appeared unannounced at his home late in the evening. When he did ultimately make a statement to Defendant about digging his own grave at work, K.L. was using a common idiom meaning Defendant's own actions caused him harm. It was in no way a threat that Defendant was responding to when he said "let's talk about your grave." Defendant was clearly angry and upset about losing his job, however, he had six months to make peace with his job loss and move on. Instead, he showed up late in the evening at his former boss's home and refused to leave

7

until the police were called. His actions and words that night were clearly intended to terrorize K.G.

BY THE COURT:

_Deborah E. Curcillo_
Deborah E. Curcillo, J.

RECEIVED
OFFICE OF
CLERK OF COURTS
2016 FEB -4 AH 10: 43
DAUPHIN COUNTY
PENNA

8