431 A.2d 909

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Angel Santo BAEZ a/k/a Angel S. B. Crespo, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 2, 1981.

Decided July 2, 1981.

J. David Ungerman (Court-appointed), Erie, for appellant.

Michael J. Veshecco, Dist. Atty., Shad Connelly, Asst. Dist. Atty., Erie, for appellee.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION OF THE COURT

KAUFFMAN, Justice.

Appellant, Angel Santo Baez ("Baez"), was convicted of murder of the first degree after a jury trial in the Court of Common Pleas of Erie County. Post verdict motions were denied, a sentence of life imprisonment was imposed, and this appeal followed.[1] Baez contends that the trial court erred in permitting the Commonwealth to read directly from a hearsay statement in an effort to impeach his credibility on cross-examination. We agree and, accordingly, vacate and remand for a new trial.

The relevant facts are as follows. On March 23, 1979, at approximately 2:00 a. m., Clark Harris ("Harris") was stabbed and killed in an all night restaurant. Baez was arrested and charged with first degree murder. At trial, the Commonwealth's case in chief was supported by the testimony of several eyewitnesses to the incident, all of whom

1. Jurisdiction is vested in this Court pursuant to the Judicial Code, Act of July 9, 1976, P.L. 586, No. 142, § 2, *as amended*, 42 Pa.C.S.A. § 722(1).

testified that Baez had stabbed Harris.[2] Their testimony varied, however, with respect to what, if anything, had occurred inside the restaurant between Harris and Baez immediately prior to the stabbing. Some witnesses testified that before the stabbing Harris had called Baez a "hippie"; others testified that no words had been exchanged between the two. One witness testified that Harris had first grabbed Baez by the shirt, while others testified that there was no physical contact prior to the stabbing.

Baez argued that he acted in self-defense, or, in the alternative, that Harris had provoked the incident by harassing, grabbing, and threatening him. He testified that on the night in question, two of his friends, Reinaldo Castillo ("Castillo") and Angel Rivera ("Rivera"), drove him to the restaurant, parked across the street, dropped him off, and then drove away. He contended that the events leading up to the stabbing began *outside* the restaurant, alleging that as he approached the restaurant, two "guys" who were bigger than he and whom he had never seen before, pushed him and called him names, and that one of them, Harris, threatened to kill him.[3] He further testified that once inside the restaurant, he walked over to the two men and told them he did not "want any trouble"; that Harris then grabbed him by the shirt, lifted him in the air, and again threatened to kill him; that as a result, he "lost [his] mind," took the knife out, and after that his mind went "blank"; and finally, that he remembered leaving the restaurant and going home, but did not remember stabbing Harris.

2. One of the eyewitnesses was Harris' cousin, Walter Collingwood ("Collingwood"), who had accompanied him to the restaurant on the evening in question.

3. Baez testified: "They started pushing me and they started calling me gut sucker—'You're a mother-fucker,' and 'You're a gut sucker;' and then they started pushing me and said 'You mother-fucker Puerto Rican, we are going to kill you.'" (N.T. 269). In contrast, Collingwood testified that nothing had occurred outside the restaurant except that he commented to Harris that the "guys" outside the restaurant, a group of eight to ten Puerto Ricans, were "long-hair hippies" and needed a haircut.

On cross-examination of Baez, the Commonwealth, over defense objection, was permitted to read directly from a written statement allegedly given by Castillo to police Detective Richard Runstedler shortly after the incident.[4]  Castillo's statement made no reference to any conflict between Harris and Baez outside the restaurant.  It thus contradicted Baez' testimony with respect to the name calling, pushing and threats, which he contended had occurred on the sidewalk.  Moreover, Baez had testified that after Castillo and Rivera dropped him off near the restaurant, they immediately drove away.  Castillo's statement, however, asserted that he and Rivera did not immediately drive away, but rather remained in front of the restaurant.  It further recounted that "two white guys" came over to the car, one of whom shook hands with Rivera before entering the restaurant, and that Castillo and Rivera later looked through the window of the restaurant for Baez before getting back into the car and driving away.

Since the statement allegedly given by Castillo to Detective Runstedler was clearly hearsay, the Commonwealth could not introduce it as substantive evidence.  Instead, while cross-examining Baez, the prosecutor read portions of the statement to him and asked whether those assertions were true.[5]  When the defense objected to this use of

4.  Castillo was killed in an unrelated automobile accident sometime before the trial.  The Commonwealth made no effort to prove, through the testimony of Detective Runstedler or otherwise, the circumstances under which the statement was given, when it was given, whether Castillo had read and understood the statement or whether he had in fact signed it.  In short, the statement was hearsay, and no effort was made to qualify it under any of the recognized exceptions to the hearsay rule.

5.  Relevant portions of the cross-examination are as follows:
Q  When you got out of the car, did the car stay there or leave?
A  Leave.
Q  You saw it leave?
A  Yes, I did.
Q  Did it leave before the two white guys came over?
A  Yes, before.  I got out and locked the door and they went.
Q  [Castillo] told the police that after you got out of the car . . . 'Just at that time two white guys came by my car and one of them said, " 'Hello' " shook hands with Rivera . . .'

Castillo's alleged statement, the trial judge said, "I am letting the Assistant District Attorney read exactly what [Castillo] said and he's asking [Baez] if that's true. It's cross-examination. There's nothing wrong with it if Mr. Runstedler took the statement." (N.T. 299). Recognizing the hearsay nature of the statement, however, he instructed the jury that it was not to be considered as substantive evidence, but was to be considered *only* for the purpose of impeaching Baez' credibility. (N.T. 300)

In an effort to support the trial judge's ruling, the Commonwealth argues that Castillo's statement was not hearsay "since it was not offered for the truth of the matter contained therein" or, alternatively, that despite its hearsay nature the statement had indicia of reliability making it sufficiently probative to warrant its use, at least for "impeachment" purposes. The Commonwealth further asserts that use of the statement, if erroneous, was harmless beyond a reasonable doubt in view of the other "overwhelming" evidence in the case. We disagree.

> A That's not true. That's not true because nobody was there. I didn't see anybody when I get out . . . just when I was walking.
> Q *[Castillo] told the police that, Me and Rivera stayed in my car. After a couple of minutes we got out of my car and looked in the window for Baez. You said they left; are you sure they left?*
> A I am sure. Yes.
> Q *So this . . . what [Castillo] is telling the police . . . is not the way you remember it happened?*
> A I wish he were here; he could testify.
> Q Is [Castillo] the kind of person that would lie? Is that the kind of friend you have?
> A I don't know. I can't say whether he lie or not. I know they take off.
>
>      *    *    *    *    *    *
>
> Q And nobody was there? [Castillo] was gone then? . . . [Castillo] and Mr. Rivera?
> A I didn't see nobody there . . . nobody was there.
>
>      *    *    *    *    *    *
>
> Q Are you sure nobody was there?
> A I am sure.
> Q *[Castillo] says he was there with Rivera.*
> A I didn't see them in there. They took off. If they were there, then nothing would have happened.
>
>      *    *    *    *    *    *

(N.T. 304–305, 306, 308). (Emphasis added).

■ The credibility of a witness may be impeached (1) by showing that on a prior occasion he made a statement, either oral or written, that is inconsistent with his present testimony; (2) by competent evidence tending to show bias, bad character for truth and honesty, or defects in memory, perception or capacity or (3) by the competent contradictory testimony of other witnesses whose version of the facts differs from that of the witness being impeached; *Commonwealth v. Hamm*, 474 Pa. 487, 378 A.2d 1219, (1976); McCormick, Evidence, § 33 at 66 (2d ed. 1972).

■ The first of these three methods of impeachment is obviously inapplicable, for it is axiomatic that when attempting to discredit a witness' testimony by means of a prior inconsistent statement, the statement *must* have been made or adopted by the witness whose credibility is being impeached. There is no contention that Baez at any time adopted the contents of Castillo's statement. The second method could be applicable only to the extent that competent testimony at variance with that of the witness always raises the possibility of defective memory or perception. Here, however, Castillo's alleged statement, which was wholly incompatible with Baez' testimony, could not have differed merely on the basis of memory or perception, but could only have been used to impeach pursuant to the third method, as "contradictory testimony." It is further axiomatic, however, that if contradictory testimony is not competent to be introduced as substantive evidence, then it equally cannot be used for impeachment purposes. *See Commonwealth v. Noble*, 371 Pa. 138, 88 A.2d 760 (1952).

■ The Commonwealth seeks to avoid the question of competency by suggesting that since its use of the statement was for the sole purpose of attacking appellant's credibility, the statement "was not offered for the truth of the matter contained therein" and thus was not hearsay. By incorporating Castillo's alleged statement into his questions on cross-examination, the prosecutor, argues the Commonwealth, only presented the jury with the fact that Castillo *made* the statement, not with the content of the statement

as substantive evidence. In our view, however, this argument either reflects a hopelessly shallow understanding of the function of the hearsay rule, or, worse, disingenuously seeks to defend a subterfuge to introduce otherwise inadmissible evidence under the guise of impeachment. The statement was offered, in fact, for no reason *but* the truth of Castillo's assertions, for impeachment by contradiction, by its very nature, is founded upon the truth of the contradictory evidence offered. In his treatise on the law of evidence, Professor Wigmore explains the principle as follows:

> [The] contradiction in itself does nothing probatively, not unless the contradicting witness or witnesses are believed in preference to the first one, i. e., unless his error is established. *It is not the contradiction, but the truth of the contradicting assertion as opposed to the first one, that constitutes the probative end.*

Wigmore, *Evidence*, III A, § 1000, p. 957 (Revised, 1970). (Emphasis supplied). It is precisely this proposition which gives rise to the axiom that a statement incompetent as direct evidence is equally incompetent for the purpose of impeachment. The statement here in question, obviously incompetent hearsay if offered as direct evidence, gained no competency by virtue of the fact that it was brought out on cross-examination in an effort to establish that Baez' recitation of the facts was untrue. Moreover, the notion that the jury, if cautioned, would not use Castillo's statement for its substance is an obvious fiction, for the content of the statement undermined the very basis of Baez' claim of provocation. Its impact could not have been more substantive had it been read directly into the record.

The principle underlying the hearsay rule was well articulated many years ago by Justice Musmanno, speaking for a unanimous court in *Johnson v. Peoples Cab Company*, 386 Pa. 513, 126 A.2d 720 (1956):

> The primary object of a trial in American courts is to bring to the tribunal, which is passing on the dispute involved, those persons who know of their own knowledge the facts to which they testify. If it were not for this

absolute sine qua non, trials could be conducted on paper without the presence of a single flesh and blood witness. But with such a pen-and-ink procedure, there would be no opportunity to check on testimonial defects such as fallacious memory, limited observation, purposeful distortions, and outright fabrication. The great engine of cross-examination would lie unused while error and perjury would travel untrammeledly to an unreliable and often-tainted judgment. Accordingly, nothing is more adamantly established in American trial procedure than that no one may testify to what somebody else told him. He may only relate what is within the sphere of his own memory brought to him by the couriers of his own senses.

386 Pa. at 515, 126 A.2d 721. The statement in question here is precisely the type of unreliable out-of-court declaration the hearsay rule was designed to exclude. Indeed, the problems associated with hearsay are multiplied here, as we are presented with an extrajudicial written statement which incorporates an extrajudicial oral statement.

Nonetheless, the Commonwealth argues that if the statement was, in fact, hearsay, its use for impeachment purposes was not error because it bore indicia of reliability sufficient to render it competent despite the fact that it did not fall into a recognized exception to the rule against hearsay. We disagree. The statement was a classic example of double hearsay, for at best it is merely Detective Runstedler's written account of what Castillo told him. Although the Commonwealth called Detective Runstedler as a witness, it failed to question him with respect to the statement. Other than the Assistant District Attorney's assertion that "Detective Runstedler, who's seated right here, took the statement from [Castillo] and he can testify as such," (N.T. 298–99), the Commonwealth made no attempt to render the statement competent. Instead, verbatim excerpts were introduced through Baez under the guise of cross-examination. Even if a rule permitting admission of hearsay bearing indicia of reliability were settled law in Pennsylvania, this form of

questioning would have been clearly improper, as neither the authenticity nor reliability of the statement had ever been established.

▪ Finally, we reject the Commonwealth's argument that the admission of the Castillo statement, if error, was harmless. Under the standard in Pennsylvania, as articulated by this Court in *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1977), for a reviewing court to conclude that an error is harmless, it must be convinced *beyond a reasonable doubt* that the error did not contribute to the verdict. We do not believe that the error here could be considered conclusively harmless under any standard, much less that established by *Story*. The crux of Baez' defense was that he lacked the requisite mental state to commit first degree murder.[6] First, he argued that he had acted in self defense. Alternatively, he argued that he had acted out of rage and anger in response to provocation by Harris. Baez' defense relied heavily on his own description of what had occurred *outside* the restaurant on the evening in question. He and Collingwood were the only persons who testified concerning those events, and their testimony conflicted.[7] The only other reference to those events was in the Castillo statement, which was devoid of any evidence of harassment and provocation on Harris' part, and which thus refuted Baez' testimony and lent credibility to Collingwood's rendition of the facts. Indeed, Castillo's statement indicated that Harris had been rather friendly, even to the point of shaking hands with Rivera.[8] Thus, the contents of the statement created

6. In order for a murder to be of the first degree the crime must be "willful, deliberate, and premeditated." *Commonwealth v. O'Searo*, 466 Pa. 224, 352 A.2d 30 (1976); *Commonwealth v. Fostar*, 455 Pa. 216, 317 A.2d 188 (1974).

7. Rivera, who, according to Castillo's statement, was also outside the restaurant that night, was not called as a witness.

8. As previously noted, Baez had testified that Castillo and Rivera had already left the area outside the restaurant when Harris and Collingwood arrived. *See* note 5 *supra*.

an inference that, at least *outside* the restaurant, Baez was not threatened or provoked by Harris.

■ By so weakening his credibility as to what happened outside the restaurant, the statement may well have led the jury to doubt Baez' testimony that he was provoked *inside* the restaurant, especially in light of the conflicting testimony of the other witnesses.[9] It was directly contradictory to Baez' version of the events; indeed, it was used for that very reason. In truth, it served not only to weaken Baez' credibility, but, as noted earlier, it undermined the very substance of his claim of provocation. We thus conclude that the erroneously admitted statement is likely to have contributed to Baez' conviction.

Accordingly, the judgment of sentence is vacated and the matter is remanded for a new trial.

FLAHERTY, J., joined in this opinion and filed a separate concurring opinion.

NIX, J., concurred in the result.

FLAHERTY, Justice, concurring.

I join in the opinion authored by Mr. Justice Kauffman, but feel constrained to write separately due to a statement contained in that opinion regarding declarations, otherwise inadmissible hearsay, which bear "indicia of reliability." The opinion of Mr. Justice Kauffman notes that the admissibility of such declarations is not the "settled law" of this Commonwealth. However, it is to be emphasized that not only is it not the *settled law*, it is not the law to *any* extent applicable in Pennsylvania.

**9.** We note that Castillo's statement did not relate to already proven facts, as there was a dispute at trial between Collingwood and Baez concerning the events which occurred outside the restaurant. Thus, it cannot be said that the statement was merely cumulative. *See Commonwealth v. Rodgers*, 472 Pa. 435, 372 A.2d 771 (1977).