West Penn Allegheny Health : 
System, Inc. and BrickStreet : 
Administration Services, : 
               Petitioners : 
                     : 
         v. : 
                     : 
Workers' Compensation Appeal : 
Board (Cochenour), :   No. 85 C.D. 2020
           Respondent :   Submitted: October 23, 2020

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
               HONORABLE P. KEVIN BROBSON, Judge[1]
               HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION
BY JUDGE FIZZANO CANNON         FILED: April 16, 2021

      West Penn Allegheny Health System, Inc. (Employer) petitions for review from the December 16, 2019, decision and order of the Workers' Compensation Appeal Board (Board) affirming in material respects the August 22, 2018, decision and order of the Workers' Compensation Judge (WCJ), who granted the Claim Petition of Eda Cochenour (Claimant). Upon review, we affirm in part and reverse in part.

## I. Background

      Employer issued a medical-only Notice of Temporary Compensation Payable after Claimant reported neck and back injuries resulting from a September

---

[1] This case was assigned to the opinion writer before January 4, 2021, when Judge Brobson became President Judge.

14, 2016, incident on Employer's parking shuttle. Reproduced Record (R.R.) at 253a. Thereafter, Claimant filed a Claim Petition seeking temporary total disability (TTD) benefits as of September 20, 2016, for cervical, thoracic, and lumbar spine injuries resulting from the incident. *Id*. at 1a-4a. On November 30, 2016, after an initial hearing on the Claim Petition, Employer issued a Notice Stopping Temporary Compensation and a Notice of Claim Denial asserting that Claimant's injuries had not occurred within the course and scope of employment. *Id*. at 334a-37a.

Claimant testified that she was employed by Employer as a nurse diabetes navigator earning $101,700 annually. R.R. at 40a. Claimant's position involved walking, standing, bending, and sitting. *Id.* On the morning of September 14, 2016, Claimant was traveling to her job at the hospital in an Employer-provided shuttle bus from a parking garage where she had an Employer-assigned parking space. *Id*. at 42a. Claimant contended that during the ride, the bus turned a corner to the left, hit a curb, bounced across the lanes in the street, and hit a curb on the other side of the street. *Id*. at 41a & 55a. Claimant was jostled but did not fall out of her seat. *Id*. at 56a.

Claimant did not immediately feel any symptoms following the shuttle incident. R.R. at 42a. Two days later, on a Friday when she was not working, Claimant felt spasms and numbness in her legs, numbness in her arms, weakness, a neckache, and a headache. *Id*. at 43a. Claimant reported the shuttle incident and her condition to Rose Scalla, a manager, when she returned to work on Monday, September 19, 2016. *Id*.

Claimant reported to Employer that she believed the shuttle driver on the date of injury was a younger-looking African-American male, but she remembered nothing else specific about him. R.R. at 85a-87a. Claimant reviewed

2

two videos of footage from the day of the incident provided by the shuttle company but did not recognize herself in either video. *Id*. at 87a. She also recalled that the shuttle she was on took a different route than it usually took the day of the incident. *Id*. at 91a. In terms of pinpointing when the incident occurred, Claimant usually began her work shift at 7:00 a.m. and it took her at least five minutes to get from the shuttle drop off point to the time clock in her work area. *Id*. at 89a & 92a. Exhibit C-5 in the record is her timecard, which states that she clocked in that day at 6:57 a.m. *See* WCJ Decision, 8/22/18, at 9; Certified Record (C.R.) #9.

Claimant's condition made it difficult for her to walk and drive and she went out of work as of the next day, September 20, 2016. R.R. at 44a-45a. Claimant treated with her primary care physician, Dr. Schogel, and Dr. Alcala, a panel orthopedist, who both kept her out of work through October 26, 2016. *Id*. at 46a-47a & 49a-50a. When Claimant returned to work in October 2016, Dr. Alcala restricted her to working four hours a day, and Claimant also missed several days due to her condition, causing some lost wages. *Id*. at 47a-48a. Subsequently, Claimant underwent a laminectomy in March 2017 and was out of work until she returned to work in mid-August on modified sedentary duty, full time with no ongoing wage loss. *Id*. at 204a-06a & 210a. Claimant received sporadic short-term and long-term disability payments while she was out of work. *Id*. at 212a-13a.

Dr. Gary Schmidt, M.D., a board-certified orthopedic surgeon, performed a laminectomy on Claimant and still treats her. R.R. at 273a & 278a. Dr. Schmidt testified that he saw and examined Claimant for the first time on November 29, 2016, after she had been referred to him by Dr. Alcala. *Id.* at 50a-51a & 268a-69a. At that time, Claimant was back to work on a part-time basis, but Dr. Schmidt took her out of work entirely due to her condition. *Id*. at 270a. Dr. Schmidt testified

3

that, given Claimant's account of the incident, her age-appropriate degenerative changes in the neck and back, and her history of fibromyalgia, it was reasonable that she did not note severe pain until two days after the incident. *Id*. at 283a, 300a, & 304a. Dr. Schmidt opined that the September 14, 2016, incident caused Claimant to sustain disabling work-related injuries in the nature of an exacerbation of underlying spondylosis at C5-6 and stenosis at L4-5. *Id*. at 277a-78a.

Employer's medical witness, Dr. Thomas Kramer, M.D., testified that he diagnosed Claimant with lumbar and cervical sprain/strain injuries, but was skeptical whether her injuries were work-related because he knew of no evidence of the incident other than her statement. R.R. at 436a & 444a-54a. However, Dr. Kramer did not deny that an injury occurred in some manner and acknowledged that pain and inflammation from such an injury can take several days to become symptomatic. *Id*. at 459a-60a.

Employer also presented Barbara Thon, a senior paralegal in Employer's legal department for medical malpractice and liability. R.R. at 95a. In early October 2016, Claimant reported to Ms. Thon that on September 14, 2016, she had been on a shuttle driven by a young African-American male when it hit a curb and Claimant was jostled. *Id*. at 96a & 100a-01a. Claimant explained to Ms. Thon that she had not reported the incident immediately because she did not feel pain or symptoms, but that she began feeling worse afterwards and was currently treating and out of work on her doctors' orders. *Id*. at 100a. Ms. Thon forwarded the information to attorneys in her department and had no further contact with Claimant or involvement in this case. *Id*. at 102a-03a.

Mary Motte, whose work in Employer's insurance department included addressing any liability issues or claims arising out of its shuttle service, also

4

testified for Employer. R.R. at 362a. Ms. Motte stated that she learned about the September 14, 2016, incident after Claimant "called in and said that she was hurt on a shuttle." *Id*. at 363a. She testified that no other employee reported an incident or an injury on a shuttle on September 14, 2016, and that Employer's internal investigation showed no evidence that an incident occurred. *Id*. at 366a-70a.

Employer witness James Zamaris was an account manager for the company that contracts with Employer for parking and shuttle services. R.R. at 105a-06a. Mr. Zamaris received an email forwarded from his supervisor (original sender and date unknown) asking for information regarding a potential incident that occurred on a shuttle between 6:30-7:00 a.m. on September 14, 2016. *Id*. at 106a-07a. The runs are driven by four regular drivers and take 10-20 minutes each, depending on traffic. *Id*. at 108a & 118a-19a. One of the drivers, Tahajud Ghafoor, known as "T," was a younger-looking African-American male, which is what the request mentioned. *Id*. at 109a-10a & 124a. Mr. Zamaris testified that neither "T" nor the other African-American shuttle driver that day reported an incident or injury that morning or afterwards. *Id*. at 111a & 114a. The shuttle "T" was driving that day was larger and "can't deviate real well" off the regular route due to its size. *Id*. at 114a. Mr. Zamaris believed an inquiry was made to "T" about what may have happened, but Mr. Zamaris did not know the result of that inquiry except that "T" declined to provide a written statement. *Id*. at 116a-17a.

In response to the request for information, Mr. Zamaris secured available video footage of two runs driven by "T" on the day and around the time of the alleged incident. R.R. at 110a-16a. Mr. Zamaris did not request, receive, or view any other footage from other drivers or runs that day, which by the time of his testimony would have been deleted and recorded over by subsequent video. *Id*. at

5

115a & 121a-23a. He acknowledged that video of the other drivers was available, but he only sought video from runs driven by "T" during the relevant time and date because he was asked to provide video of a younger-looking African-American driver and he deduced it was "T." *Id*. at 122a-24a.

Roger Rosser, the safety manager for the shuttle company, testified that Mr. Zamaris asked him to pull the video for the day and time at issue and review it for any unusual incidents or evidence of reckless driving by a younger-looking African- American male driver, whom Mr. Rosser, like Mr. Zamaris, deduced to be "T." R.R. at 155a & 164a. Generally, one view of the company's video showed the passengers in the interior bus cabin, and another view recorded outward from the windshield to show the route being taken. *Id*. at 156a. The video storage cards last 30-35 days before being recorded over unless they are pulled due to a reported incident. *Id*. at 158a. Based on the information provided by Mr. Zamaris, Mr. Rosser pulled the footage from the two runs driven by "T" between 6:33 a.m. and 6:56 a.m. *Id*. at 158a-60a. Mr. Rosser did not pull or review video of any other runs from that morning. *Id*. at 162a. Mr. Rosser noted that neither of the buses driven by the two African-American drivers needed repairs after the date at issue. *Id*. at 163a.

Employer also presented both African-American drivers, Tahajud Ghafoor (whom Mr. Zamaris and Mr. Rosser previously identified as "T") and Raymond Roberts. Mr. Ghafoor testified that he is one of the regular drivers on the morning shuttle shift and that he drove a shuttle on September 14, 2016. R.R. at 167a. Due to the size of his bus, he would not have been able to drive a different route other than his usual route. *Id*. He did not recall an incident matching Claimant's description occurring on September 14, 2016. *Id*. at 170a. Mr. Roberts testified that he drove the same sized vehicle as Mr. Ghafoor and that they can vary

6

routes if there is traffic, but because the buses are large, "there's only so many ways you can go." *Id*. at 183a. Mr. Roberts agreed that he looks older than Mr. Ghafoor. *Id*. at 184a. He did not recall an incident while he was driving on September 14, 2016. *Id*. at 185a. Mr. Roberts testified that if an incident had happened as described, it would have shown up on the camera and would have to be reported, particularly if there was vehicle damage. *Id*. at 185a-86a. Claimant did not recognize Mr. Ghafoor or Mr. Roberts, whom she had seen when they testified, as being the driver of the shuttle on the date of her injury. *Id*. at 208a.

Employer also presented Thao Dinh from its human resources department. R.R. at 511a. She handles Employer's short-term disability program. *Id*. at 513a. At the time of the incident, Employer fully self-funded short-term disability at 60% of an employee's salary up to a maximum of $2,000 per week with a 24-week cap. *Id*. at 517a & 520a. Claimant was approved for short-term disability from the date of injury September 16, 2016 (although Claimant did not go out of work until September 20, 2016), through October 26, 2016. *Id*. at 521a-26a. Claimant then received extensions and staggered payments, some of which were partial because she was working part-time, through March 10, 2017, when Claimant reached the 24-week maximum. *Id*. at 526a, 529a, & 539a. Ms. Dinh stated that short-term disability benefits are taxed. *Id*. at 539a-43a. This is confirmed by Exhibit 8 to her deposition, Employer's payroll printouts, which show that the sums Claimant received as short-term disability payments were net of deductions for federal and state income taxes, Medicare and Social Security, Pennsylvania unemployment compensation, and local township taxes. *Id.* at 621a-24a. The WCJ noted that Claimant received a total of $25,616.73 in short-term disability, which

7

Exhibit 8 to Ms. Dinh's deposition establishes was the gross amount before the deductions. *See* WCJ Decision at 14; *see also* R.R. at 621a-24a.[2]

## II.  The WCJ and Board Decisions

The WCJ stated during the hearing that he had viewed the video of the shuttle runs driven by "T" and did not detect an incident that corresponded to Claimant's description.  R.R. at 147a-48a; *see also* WCJ Decision at 7-8; C.R. #9. Ultimately, the parties stipulated on the record that based on the evidence that the second shuttle run driven by "T" ended at 6:56 a.m. and that Claimant clocked in at 6:57 a.m., Claimant could not have been on the second run because she would not have had time to get from the shuttle drop off to the time clock, which she previously stated took at least five minutes.  R.R. at 231a.  The parties agreed, however, that this did not preclude her being on the first run shown in the video.  *Id.*

The WCJ granted Claimant's Petition, finding that she sustained a disabling work-related injury defined as "an exacerbation of a preexisting C5-6 spondylosis and L4-5 stenosis" requiring a lumbar laminectomy.  WCJ Decision at 16-17; C.R. #9.  The WCJ awarded Claimant TTD benefits from September 20, 2016, through October 26, 2016; partial disability benefits from October 26, 2016, through November 29, 2016; and total disability benefits again from November 29, 2016, through August 14, 2017, when Claimant resumed full-time work.  *Id.* at 17; C.R. #9.  The WCJ also found Employer was entitled to a credit against only the net

---

[2] For example, on December 2, 2016, Claimant's payroll statement shows a gross short-term disability payment of $2,077.06.  R.R. at 622a.  With two days of holiday pay and $5.52 received for "IMP INC," Claimant's total gross pay for that period was $2,865.30.  *Id.*  From that amount, $713.03 total was withheld for federal and state income taxes, Social Security and Medicare, Pennsylvania unemployment compensation, and local taxes based (presumably) on Claimant's area of residence.  *Id.*  After additional deductions for Claimant's employee health insurance and other similar employee options, Claimant received a net deposit of $1,755.60.  *Id.*

8

amount of short-term and long-term disability benefits Claimant received during the relevant time period, rather than against the gross amount that Employer paid. *Id.*; C.R. #9. On appeal, the Board affirmed as to Claimant's eligibility for workers' compensation wage loss benefits, the onset date for those benefits, and that her short-term disability payments could be credited by Employer on a net basis.[3] Board Decision, 12/16/19, at 11-16; C.R. #12. Employer then petitioned this Court for review.

## III. Issues

Employer appeals to this Court, asserting that: (1) the WCJ's finding that Claimant sustained a disabling work-related injury was not based on substantial, competent evidence of record, but rather on speculation by the WCJ regarding the events of the date of injury; (2) if a work-related injury occurred, the medical evidence did not support the WCJ's award of TTD benefits until November 29, 2016, when Claimant was first seen by Dr. Schmidt; and (3) the WCJ should have awarded Employer's credit for short-term disability benefits on a gross pre-tax basis even though the amount Claimant actually received was the net amount after taxes were withheld. Employer's Br. at 4.[4]

---

[3] The Board also concluded that based on the evidence, Employer may seek credit of Claimant's long-term disability benefits on a gross basis and reversed the WCJ on that issue. Board Decision, 12/16/19, at 16-17; C.R. #12. As Claimant has not appealed the long-term disability issue, this opinion does not address long-term disability benefits.

[4] Employer states its issues *verbatim* as follows:

> A. Whether the [Board] erred in affirming the WCJ's Order that was not based upon sufficient, competent evidence of record as it was instead based upon the speculation or belief of the WCJ as to what may have occurred on the alleged [date] of injury as opposed to being based upon the actual evidence of record?

## A. Substantial Competent Evidence of Occurrence of Work-Related Injury

Employer first argues that the WCJ's determination that Claimant sustained a disabling work-related injury was not based on substantial and competent evidence that an incident occurred on September 14, 2016, but rather on impermissible speculation. *See* Employer's Br. at 38-46. Employer points to its witnesses' testimony either denying or finding no evidence of a shuttle incident on that day involving a younger-looking African-American male driver, as Claimant recalled at the time. *See id.* at 38-40. Employer acknowledges that the WCJ found Claimant's testimony concerning the incident to be credible, but asserts that the WCJ wrongly ignored evidence to the contrary, engaged in "pure speculation" to "come up with some alternative theory upon which to award compensation benefits" and went "out of his way to rule in favor of [] Claimant." *Id.* at 40-43.

Claimant responds that Employer, which had access to all of the shuttle drivers and video from the morning of the incident, chose to limit its presentation to video of "T's" shuttle runs and testimony from the two African-American drivers, based on Claimant's initial recollection of the driver she had that morning. *See* Claimant's Br. at 24-26. According to Claimant, Employer's choice not to investigate the matter further and present potential additional evidence that might

---

B.  Whether the [Board] erred in affirming the WCJ's Order that was not supported by substantial competent evidence as to the award of disability given the WCJ awarded periods of disability that were [not] supported by the medical evidence of record?

C.  Whether the [Board] erred in affirming the WCJ's Order that erroneously awarded a credit for only the net short term disability benefits paid rather than the gross benefits as directed by the Workers' Compensation Act [Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710] as well as case law?

Employer's Br. at 4.

refute Claimant's account of the incident (even if she did not correctly recall the driver that morning) implicitly supports the WCJ's determination that her accounts, both in her testimony before the WCJ and previously to other witnesses, including Ms. Thon, Ms. Motte, and Dr. Schmidt, were consistent and credible. *See id.* at 26. Moreover, Claimant avers that she met her burden to show that being jostled in her shuttle seat caused her to sustain disabling work-related injuries. *See id.* at 27. She adds that it was not her burden to show that what happened was serious or remarkable enough that it would have led to formal acknowledgements or reports of other injuries, vehicle damage, or even a specific incident report. *See id.*

As this Court has often opined, the primary role of the WCJ is well settled:

> The WCJ is the fact finder, and it is solely for the WCJ . . . to assess credibility and to resolve conflicts in the evidence. Neither the Board nor this Court may reweigh the evidence or the WCJ's credibility determinations. In addition, it is solely for the WCJ, as the factfinder, to determine what weight to give to any evidence. . . . As such, the WCJ may reject the testimony of any witness in whole or in part, even if that testimony is uncontradicted.

*Hawbaker v. Workers' Comp. Appeal Bd. (Kriner's Quality Roofing Servs. & Uninsured Emp. Guar. Fund)*, 159 A.3d 61, 69 (Pa. Cmwlth. 2017) (internal citations, quotations, and brackets omitted). "Determining the credibility of the witnesses is the quintessential function of the fact finder . . . . It is not an exact science, and the ultimate conclusion comprises far more than a tally sheet of its various components." *Dorsey v. Workers' Comp. Appeal Bd. (Crossing Constr. Co.)*, 893 A.2d 191, 195-96 (Pa. Cmwlth. 2006) (declining to "dissect and analyze each of the WCJ's reasons for his credibility determination"). An appellate tribunal must view the WCJ's reasoning as a whole and may overturn a credibility

11

determination only if it is arbitrary and capricious, so fundamentally dependent on a misapprehension of material facts, or so otherwise flawed, as to render it irrational. *See Casne v. Workers' Comp. Appeal Bd. (STAT Couriers, Inc., and State Workers' Ins. Fund)*, 962 A.2d 14 (Pa. Cmwlth. 2008). The reliability of a witness's memory is part of a fact-finder's credibility determination. *See Commonwealth v. Baez*, 431 A.2d 909, 912 (Pa. 1981).

Moreover, "substantial evidence" is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. *See Waldameer Park, Inc. v. Workers' Comp. Appeal Bd. (Morrison)*, 819 A.2d 164 (Pa. Cmwlth. 2003); *Hoffmaster v. Workers' Comp. Appeal Bd. (Senco Prods., Inc.)*, 721 A.2d 1152 (Pa. Cmwlth. 1998). In performing a substantial evidence analysis, the evidence must be viewed in a light most favorable to the party that prevailed before the WCJ. *Waldameer Park, Inc.*; *Hoffmaster*. In a substantial evidence analysis where both parties present evidence, it is immaterial that there is evidence in the record supporting a factual finding contrary to that made by the WCJ; rather, the pertinent inquiry is whether there is any evidence which supports the WCJ's factual finding. *Waldameer Park, Inc.*; *Hoffmaster*.

Mere speculation or conjecture is insufficient to support a factual finding, but where there exists the ability to draw reasonable and logical inferences from evidence that is presented, including testimony, a conclusion so derived will be sufficient, even if it may not be the only possible conclusion. *See Fitzpatrick v. Natter*, 961 A.2d 1229, 1241-42 (Pa. 2008); *see also Moore v. Workmen's Comp. Appeal Bd.*, 652 A.2d 802, 806 (Pa. 1995) (referee did not engage in speculation where there was relevant supporting evidence).

Here, the WCJ observed and heard Claimant testify three times in person, including under cross-examination by Employer's counsel, and found Claimant fully credible. *See* WCJ Decision at 14; C.R. #9. The WCJ observed that Claimant consistently maintained her account of the September 14, 2016, incident while under oath. *See id.* at 14; C.R. #9. The WCJ added that Claimant was candid as to aspects of the experience that she did not recall, including the exact identity of the driver beyond her initial belief that he had been a younger-looking African-American male. *See id.* at 15; C.R. #9.

In considering why Claimant did not immediately report what happened, the WCJ noted that Claimant maintained, also candidly, that she did not feel severe symptoms just after the incident, but that they developed two days later. *See* WCJ Decision at 15; C.R. #9. After that, however, the WCJ remarked that Claimant reported the incident to Ms. Scalla on September 19, 2016, went directly to Employee Health, and treated consistently thereafter. *See id.* at 5-6 & 9. The WCJ took into consideration Dr. Schmidt's testimony as to Claimant's recollection of the incident and remarked that it was consistent with her testimony under oath. *See id.* at 10 & 14-15. The WCJ also heard testimony from Employer's fact witnesses, including Ms. Thon, Mr. Zamaris, and Ms. Motte, that Claimant reported an injury from an incident on the parking shuttle not long after the date she asserted it occurred. *See id.* at 6-7, 11, & 14-15.

On the other hand, the WCJ acknowledged the testimony of both African-American drivers that no incident was recalled or reported. *See* WCJ Decision at 8-9; C.R. #9. The WCJ also watched the video of "T's" runs that was pulled based on Claimant's initial recollection that the driver was a younger-looking African-American, which did not confirm an incident occurred. *See id.* at 7-8.

13

Further, the WCJ considered the testimony of Employer's medical witness, Dr. Kramer, who acknowledged Claimant's recounting of the incident but remained skeptical due to the lack of any corroborating evidence. *See id.* at 12-13.

After considering all the evidence, the WCJ concluded that Claimant's testimony had been credible as to the occurrence of the work-related parking shuttle incident that caused her injury. *See* WCJ Decision at 14; C.R. #9. The WCJ stated that Claimant had testified before him on multiple occasions and her account of the incident was consistent throughout. *See id.* Claimant's account was also consistent with what she had previously told Dr. Schmidt, Dr. Kramer, and Employer's fact witnesses, particularly Ms. Thon from Employer's legal department, who took Claimant's report of the incident. *See id.* at 14-15.

The WCJ's conclusion that the incident occurred as Claimant described it was not shaken by Employer's efforts to disprove her initial recollection of the driver, including the testimony of "T," Mr. Ghafoor, who fit Claimant's description but did not recall any incident during the runs he drove on September 14, 2016. The WCJ explained:

> I note that the Claimant indicated in her conversation with Barbara Thon that she believed that the driver of the shuttle on September 14, 2016, was a younger[-]looking African American male and that Mr. Ghafoor would be the only individual who was driving her shuttle who would fit that description. The Claimant, in my judgement, was mistaken in identifying the driver. I believe that this mistake is not unexpected. The Claimant rode a shuttle on a daily basis and may have been more familiar with Mr. Ghafoor.

WCJ Decision at 15; C.R. #9. The WCJ presented an additional basis for Claimant's credibility, specifically that once she realized the full extent of disability benefits

14

available to her, which exceeded what she would receive through workers' compensation, she did not drop her claim, indicating her ongoing belief in its validity. *See id.* at 14.

In upholding the WCJ's decision on appeal, the Board noted that the video selected for viewing by Employer based on Claimant's initial belief that the driver had been a younger-looking African-American male was not likely to have been the correct choice, because one of the two runs shown in that video was too early and the other was too late, based on Claimant's clock-in time. *See* Board Decision at 12; C.R. #12. Further, while Employer presented testimony from the two African-American drivers and submitted the related videos, the Board noted that Employer chose not to present testimony or video from the other drivers, although doing so might have strengthened its case in light of Claimant's faulty recollection of the driver of her shuttle that day. *See id.* Ultimately, the Board agreed with the WCJ that Claimant's memory of the actual incident, regardless of who was the driver, was consistent and credible; thus, the Board found the WCJ's credibility finding was not arbitrary or capricious. *See id.*

We agree with the Board that the WCJ's determinations in this regard are not subject to disturbance on appeal. Claimant's memory may not have been accurate as to who was driving the shuttle, but her recollection of the incident itself did not waver over three in-person testimonies under oath. *See* R.R. at 41a-42a, 55a, 85a-91a & 208a. Her recollection was also corroborated by the testimony of Dr. Schmidt, Ms. Thon, and Ms. Motte, all of whom either spoke with Claimant personally when she reported the incident shortly after it occurred or were informed about the incident by someone to whom Claimant had reported it. *See id.* at 96a, 100a-01a, 269a & 363a-65a. Nothing prevented Employer from presenting

15

additional video evidence or additional witnesses who might have more definitively refuted Claimant's account, such as the two additional drivers, the supervisor to whom Claimant first reported the incident and injury, or the employee health clinic provider who first saw Claimant for her injuries.

As Claimant correctly points out, her burden was not to prove that the incident was so severe or serious as to result in vehicle damage, injury to others, or even a formal report. *See* Claimant's Br. at 27. Her burden was to prove that she sustained a work-related disabling injury. *See, e.g.*, *Ingrassia v. Workers' Comp. Appeal Bd. (Universal Health Servs., Inc.)*, 126 A.3d 394, 402 (Pa. Cmwlth. 2015). In the end, the WCJ believed Claimant and found sufficient corroborative evidence in the record to support her testimony. *See* WCJ Decision at 14-15; C.R. #9. This was not speculation, but a balanced consideration of all the evidence at hand. We find that the WCJ's decision was supported by substantial evidence. We therefore affirm the Board's affirmance of the WCJ's determination that Claimant sustained a disabling work-related injury on September 14, 2016.

## B. Substantial Competent Evidence of Disability Onset Date

Next, Employer asserts that even if Claimant sustained a disabling work-related injury, the WCJ's award of benefits to Claimant as of September 20, 2016, when she first stopped working due to her injuries, was not supported by substantial record evidence. *See* Employer's Br. at 46-47. Employer argues that benefits should only have been awarded as of November 29, 2016, when Dr. Schmidt first saw Claimant and kept her out of work. *See id.* Claimant responds that the WCJ's determination is amply supported by Claimant's credible testimony concerning the incident and her development of disabling pain two days later, Dr. Schmidt's credible testimony that Claimant sustained disabling injuries that

reasonably manifested two days after the September 14, 2016, incident, and Dr. Kramer's acknowledgement that if the incident happened as described by Claimant, she would have sustained at least sprain/strain injuries on September 14, 2016. *See* Claimant's Br. at 28-30.

In a claim proceeding, the burden is on the claimant to prove all necessary elements, including the date of onset of disability. *See Pa. Uninsured Emps. Guar. Fund v. Workers' Comp. Appeal Bd. (Bonner)*, 85 A.3d 1109, 1114-15 (Pa. Cmwlth. 2014). As long as there is competent supporting medical evidence, the WCJ's factual determination of the onset of the disability will not be overturned on appeal. *See Ingrassia*, 126 A.3d at 403.

Here, Claimant testified that due to her condition, she did not return to work the day after her appointment with Employee Health, September 19, 2016. *See* R.R. at 45a. Claimant also treated with her primary care physician, Dr. Schogel, and Dr. Alcala, a panel orthopedist, and testified that both kept her out of work. *See id.* at 46a & 50a-51a. She returned to work in late October 2016 with Dr. Alcala's restrictions limiting her to four hours a day and she missed some days thereafter due to her condition. *See id.* at 47a-48a. As a result of working part time due to Dr. Alcala's restrictions and missing days due to her condition, she sustained wage losses. *See id.* Dr. Schmidt testified that he saw and examined Claimant for the first time on November 29, 2016, and, although she was then working part time, he took her out of work entirely on that date. *See id.* at 269a-70a.

As set forth above, the WCJ found Claimant wholly credible. *See* WCJ Decision at 14; C.R. #9. This included Claimant's testimony that the nature and extent of her injuries and condition after the incident were too disabling to resume work after her Employee Health appointment on September 19, 2016. *See* R.R. at

17

45a. The WCJ's credibility determination also included Claimant's unobjected-to testimony that Dr. Schogel and Dr. Alcala, both of whom saw Claimant before Dr. Schmidt, kept her out of work entirely through late October, after which she returned part time under restrictions. *See id.* at 46a & 50a-51a. Based on finding Claimant's testimony entirely credible, the WCJ awarded TTD benefits from September 20, 2016, through October 26, 2016, and partial benefits based on Claimant's part-time return to work under Dr. Alcala's restrictions from October 26, 2016, through November 29, 2016, when Claimant first saw Dr. Schmidt and he took her entirely out of work. *See id.* at 16.

The Board upheld the WCJ's award, citing the WCJ's credibility determination in Claimant's favor as to the time between the incident and November 29, 2016. *See* Board Decision at 13-14 n.4; C.R. #12. We agree. As cited above with reference to *Hawbaker* and *Casne*, a WCJ's credibility determination must be upheld unless arbitrary and capricious; the WCJ's conclusions here as to the onset of disability are neither. Claimant's testimony, which was credited by the WCJ, constituted substantial evidence concerning the onset of Claimant's disability on September 20, 2016. *Waldameer Park, Inc.*; *Hoffmaster*. We therefore affirm that date for the commencement of Claimant's benefits as set forth in the WCJ's opinion and order.

### C. Short-Term Disability Credit on Gross or Net Basis

### 1. Applicable Law

Finally, Employer asserts that the Board erred in affirming the WCJ's decision to award Employer a credit for Claimant's short-term disability payments on the amount that Claimant received, which was net after taxes, rather than the

18

gross pre-tax amount that Employer actually paid.[5] *See* Employer's Br. at 47-50. The WCJ did not cite legal authority for concluding that Employer's credit was limited to the net amount Claimant received, but the Board, in affirming, cited Section 204(a) of the Pennsylvania Workers' Compensation Act[6] (Act), 77 P.S. § 71(a), and *Murphy v. Workers' Compensation Appeal Board (City of Philadelphia)*, 871 A.2d 312, 316 (Pa. Cmwlth. 2005). *See* Board Decision at 14-16; C.R. #12. The Board stated that under Section 204(a) and *Murphy*, because the short-term disability payments Claimant received were in lieu of compensation, Employer was entitled to a credit, but only "to that amount actually paid to Claimant," *i.e.*, the net amount. *See id.* at 16; C.R. #12.

An employer is entitled to a credit or offset against its workers' compensation liability for the amounts paid to a disabled employee that are not wages for work performed but are in relief of the employee's inability to work. *See Marsh v. Workmen's Comp. Appeal Bd. (Prudential Ins. Co.)*, 673 A.2d 33, 35 (Pa. Cmwlth. 1996). This is true even where the employer makes disability payments while denying that it is liable to pay workers' compensation benefits. *See Boeing Helicopters v. Workers' Comp. Appeal Bd. (Cobb)*, 713 A.2d 1181, 1185 (Pa. Cmwlth. 1998). An employer seeking credit for such disability payments bears the burden of proving the extent to which it funded the payments at issue. *See Glaze v. Workers' Comp. Appeal Bd. (City of Pittsburgh)*, 41 A.3d 190, 196 (Pa. Cmwlth. 2012).

[5] As noted above in note 2, the WCJ also awarded Employer a credit for long-term benefits on a basis net of taxes, which the Board reversed because there was no evidence that taxes were withheld from those funds received by Claimant. Those determinations are not at issue in this appeal.

[6] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

19

Employer posits that the WCJ and the Board incorrectly "attempted to apply" Section 204(a) of the Act, 77 P.S. § 71(a), which, *inter alia*, addresses offsets for pension benefits received on a disability basis and, through regulations, limits them to a net recovery based on the claimant's received sums. *See* Employer's Br. at 47. Employer contends the issue is instead governed by Section 319 of the Act, 77 P.S. § 671, which specifically addresses non-pension disability benefits and allows employers to subrogate them "to the amount so paid." *Id*. at 47-48 (citing *Station v. Workmen's Comp. Appeal Bd. (Pittsburgh Steelers Sports, Inc.)*, 608 A.2d 625 (Pa. Cmwlth. 1992), *superseded by statute on other grounds as recognized in Pittsburgh Steelers Sports, Inc. v. Workers' Comp. Appeal Bd. (Trucks)*, 224 A.3d 442 (Pa. Cmwlth. 2020)). Employer also cites *Marsh* for the premise that the income tax aspects of non-pension disability payments are not relevant to an employer's eligibility to receive a credit for such payments to the extent that it paid a gross or pre-tax amount to the claimant. *See id.* at 49-50.

Employer is correct that Section 204(a) of the Act does not apply here. Section 204(a) authorizes employer offsets when the injured worker's receipt of workers' compensation benefits is concurrent with receipt of unemployment compensation benefits, old age Social Security benefits, severance benefits, and pension benefits. *See* 77 P.S. § 71(a). Read superficially, Section 204(a) and the accompanying regulations allow an employer to claim credit only to the amount "received by the employe" and "the net amount an employe receives," which at first glance appears to limit an employer credit to a net recovery. *See* 77 P.S. § 71(a) & 34 Pa. Code § 123.8. Although the term "disability benefits" appears in the regulation definitions, it is as part of the definition of "pension" funds intended to provide retirement income, which may consist of funds for age-related retirement or

20

for a disability that may or may not be work-related. 34 Pa. Code § 123.2.[7] The short-term disability benefits Claimant received here are not in the nature of a pension. Therefore, Section 204(a) is inapposite to this matter and the Board erred in relying upon it, as well as on *Murphy*, which is a pension case, to limit Employer's credit to a net amount. *See* Board Decision at 14; C.R. #12.

Employer correctly asserts that employer credits for non-pension disability payments, which injured workers like Claimant may receive when an employer challenges a workers' compensation claim and litigation is pending, are governed by the second paragraph of Section 319 of the Act, which states:

> Where an employe has received payments for the disability or medical expense resulting from an injury in the course of his employment paid by the employer or an insurance company on the basis that the injury and disability were not compensable under this [A]ct in the event of an agreement or award for that injury *the employer or insurance company who made the payments shall be subrogated out of the agreement or award to the amount so paid*, if the right to subrogation is agreed to by the parties or is established at the time of hearing before the [WCJ] or the [B]oard.

---

[7] With regard to pension benefits, which may include disability pension benefits, Section 204(a) states: "[T]he benefits from a pension plan to the extent funded by the employer directly liable for the payment of compensation which are received by an employe shall also be credited against the amount of the award made[.]" 77 P.S. § 71(a). The regulations pertaining to Section 204(a) state that it is limited to "amounts received from defined-benefit and defined-contribution plans" and that "[w]orkers' compensation benefits otherwise payable shall be offset by the net amount an employe receives in pension benefits to the extent funded by the employer directly liable for the payment of workers' compensation." 34 Pa. Code. § 123.8. The regulations define "net" as: "The amount of unemployment compensation, Social Security (old age), severance or pension benefits received by the employe after required deductions for local, State and Federal taxes and amounts deducted under the Federal Insurance Contributions Act (FICA) (26 U.S.C.A. §§ 3101-3126)." 34 Pa. Code § 123.2.

21

77 P.S. § 671 (emphasis added). Relevant to this appeal, the key language in Section 319 is "the amount so paid" by the employer, which Employer argues allows it to claim a credit on the pre-tax gross amount of payments made, as compared with the inapposite language in Section 204(a) to the effect that credits are based on the amount "received by the employe," which indicates allowance of a post-tax net credit based on the amount the claimant actually receives. *Compare* 77 P.S. § 671, *with* 77 P.S. § 71(a).

Our courts have not directly addressed whether a credit for non-pension disability payments under Section 319 may be taken by the employer on the gross amount paid or if it is limited to an amount net after withheld taxes.[8]  In *Marsh*, the employer contested the work-relatedness of the claimant's injury and the claimant received non-pension short-term disability benefits under Section 319.  *See* 673 A.2d at 34.  The employer sought a credit when the claimant was subsequently awarded workers' compensation benefits, but the claimant argued that the short-term disability benefits he received were in the nature of sick leave payments and therefore not subject to a credit.  *See id.* at 35.  This Court found against the claimant on that issue, and then added:

> Marsh attempts to distinguish the short-term disability payments and workers' compensation benefits based on their taxability.  Marsh argues that because taxes were withheld from the disability payments, Prudential should not get credit against workers' compensation benefits,

---

[8] Previous decisions addressing this question have generally done so in the context of Section 204(a) and its regulations rather than Section 319.  *See, e.g.*, *Dailey v. Workers' Comp. Appeal Bd. (Commonwealth of Pa.)* (Pa. Cmwlth., No. 97 C.D. 2018, filed Aug. 8, 2018); *Harrison v. Workers' Comp. Appeal Bd. (Commonwealth of Pa.)*, 165 A.3d 1019 (Pa. Cmwlth. 2017); *Minnich v. Workers' Comp. Appeal Bd. (Wiremold Co.)* (Pa. Cmwlth., Nos. 2293 C.D. 2007 & 12 C.D. 2008, filed Nov. 12, 2008).

> which are not taxed. Although Marsh may have reason to concern himself with the tax attributes of various types of compensation, the income tax treatment of the employer-provided payments is irrelevant to the issue of credit.

*Id.* In a footnote, this Court explained: "That the Internal Revenue Code exempts workers' compensation benefits from income, 26 U.S.C. § 104(a), while including all or part of other employer-provided benefits is largely a matter of Congressional policy objectives and often has little to do with actual differences between items of income." *Id.* at 35 n.2. *Marsh* therefore considered whether the tax aspects of non-pension disability payments disqualify them from being subject to an employer credit at all under Section 319. The answer is no, but that does not quite answer the question here, which is whether, having established that such payments are subject to an employer credit, such a credit should be based on the pre-tax gross amount paid by the employer or the post-tax net amount received by the claimant.

In *Station*, a professional football player sustained a career-ending injury and sought workers' compensation benefits. *See* 608 A.2d at 627. The claimant had previously received an "injury grievance" payment in a lump sum of $18,000 based on the terms of a league-wide collective bargaining agreement. *See id.* at 626. He was awarded workers' compensation benefits with the caveat that the employer could modify his benefits via a credit or reimbursement based on other compensation received, but the credit would be on the net post-tax amount and not the gross pre-tax amount of $18,000. *See id.* at 627 & 632. This Court did not analyze the question under Section 319, but nevertheless found that the employer could receive credit for the gross amount, stating:

> We agree with the Board's decision that the gross award to [c]laimant was his "payment," subject to reimbursement. That portion of an employe's

23

> compensation withheld by an employer as required by law remains the property of the employe, who can file an appropriate return to have it refunded to him if taxes are not owed thereon. The total amount of the award, therefore, was [c]laimant's payment, out of which [e]mployer paid taxes on [c]laimant's behalf. Accordingly, we hold the entire (gross) amount of the award to be reimbursable and affirm the Board's decision that the amount is $18,000.00.

*Id.* at 632. *Station*'s determination that credits on injury grievance payments made to professional athletes may be assessed on the gross amount paid by the employer has not been cited in cases not involving professional athletes, but its approach may be analogized to the facts here concerning Employer's payment to Claimant of short-term disability payments because both sums are in the nature of payments made to an injured person in lieu of salary. *See Joyner v. Workmen's Comp. Appeal Bd. (Pittsburgh Steelers Sports, Inc.)*, 667 A.2d 13, 14 n.1 (Pa. Cmwlth. 1995) ("An injury grievance is a claim or complaint . . . wherein the player alleges that he is released from the club while still injured and is physically unable to perform the services required of him by that contract because of an injury incurred in the performance of his services under the contract.").

Accordingly, for the purposes of this appeal, which addresses non-pension disability payments, we find Section 319 instructive. Section 319 clearly states that when a claimant receives workers' compensation benefits after litigation of a claim petition, "the employer or insurance company who made the payments shall be subrogated out of the . . . award *to the amount so paid*." 77 P.S. § 671 (emphasis added). We are bound to interpret statutory language according to its plain meaning. *See, e.g.*, *Blessing v. Workers' Comp. Appeal Bd. (Heintz Corp.)*, 737 A.2d 820, 822 (Pa. Cmwlth. 1999) (citing Section 1903(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1903(a)). Moreover, as the WCJ correctly

24

observed, if an employer withholds taxes from disability payments and there is a subsequent determination that the claimant should have received untaxed workers' compensation benefits instead of taxed disability payments, the claimant may seek a tax refund for the amounts withheld by the employer. *See* WCJ Decision at 16; C.R. #9.

Thus, crediting the employer with the gross amount of its short-term disability payments creates neither a loss to the claimant nor a windfall to the employer. By contrast, allowing the employer only a net credit creates a loss to the employer and a potential windfall to the claimant, as only the claimant, not the employer, may recoup taxes improperly withheld. We therefore find that an employer may seek a credit for the gross pre-tax amount it pays out in non-pension disability payments pending adjudication of a claim petition.

## 2. Evidence of Amount Paid by Employer

In support of its request for a credit on the gross amount it paid out in short-term disability payments, Employer presented Thao Dinh from its human resources department. *See* R.R. at 511a-52a. She manages Employer's short-term disability program through Sun Life. *See id.* at 513a & 516a. She testified that at the time of the incident, Employer fully self-funded its short-term disability at 60% of an employee's salary up to a maximum of $2,000 per week with a 24-week cap. *See id.* at 517a, 519a & 520a. Ms. Dinh further explained that Claimant was approved for and received short-term disability when she was out of work entirely from September 20, 2016, through October 26, 2016. *See id.* at 521a. Subsequently, Claimant received extensions and staggered payments, some of which were partial because she was working part-time, through March 10, 2017, when she reached the 24-week maximum. *See id.* at 521a, 526a & 529a-30a.

25

Ms. Dinh stated that Claimant's short-term disability benefit payments had taxes withheld. *See* R.R. at 539a-43a. This was supported by Exhibit 8 to Ms. Dinh's deposition, which was Claimant's payroll records showing short-term disability payments for the relevant dates, including both the gross "starting" figure and deductions withheld for federal, state, and local taxes. *See id.* at 621a-24a.[9] The WCJ credited Ms. Dinh's testimony, found that Claimant received a "total amount" of $25,616.73 in short-term disability, and concluded that Employer's credit should be limited to "the net amount paid to the Claimant." WCJ Decision at 14 & 16; C.R. #9. Exhibit 8 to Ms. Dinh's deposition clarifies, however, that $25,616.73 was the *gross* amount paid out by Employer prior to deductions for the amounts it withheld for tax purposes. *See* R.R. at 621a-24a. Therefore, the actual "total amount" received by Claimant was lower than $25,616.73. The Board correctly characterized the amount at issue, writing that "Claimant's short-term disability benefits totaled $25,616.73, out of which taxes were taken." Board Decision at 15-16; C.R. #12.

As explained above, the WCJ found that Employer's credit on the short-term disability payments should be on a net basis, and the Board affirmed on the basis that the payments Claimant received were governed by Section 204(a) of the Act, which would have allowed only a net recovery. *See* WCJ Decision at 16; C.R. #9; Board Decision at 14-16; C.R. #12. But because Section 319 governs the payments at issue here and directs that an employer may claim a credit to the gross amount paid, as discussed *supra*, the WCJ and the Board both erred in limiting Employer's credit to the net amount paid to Claimant. Employer was therefore entitled to a credit of $25,616.73, which the evidence established was the *gross*

---

[9] *See supra* note 3 for a breakdown of a representative pay period.

amount of short-term disability benefits paid by Employer. *See* WCJ Decision at 14 & 16; Board Decision at 15-16.

It is true that Claimant directly received less than $25,616.73 after withholdings for federal, state, and local taxes. However, the appropriate legal standard, based on Section 319 of the Act, specifically addresses non-pension disability benefits like those at issue here and allows employers to subrogate them "to the amount so paid." 77 P.S. § 671. Employer therefore satisfactorily established its entitlement to a credit for the full amount it *paid*, *i.e.*, the gross pre-tax payment of $25,616.73. To the extent there may have been amounts withheld for tax purposes that Claimant should have received, she may seek refunds from the appropriate taxing authorities. *See* WCJ Decision at 16; *see also Station*, 608 A.2d at 632.

In summary, the WCJ erred in concluding that Employer did not prove its entitlement in both law and fact to a credit for the gross amount of $25,616.73 that it paid. *See* WCJ Decision at 16; C.R. #9. The Board subsequently erred in finding this issue is governed by Section 204(a) of the Act, 77 P.S. § 71(a), the regulations concerning Section 204(a), and *Murphy*, all of which pertain to and set forth specific rules for credits based on disability payments received in the nature of a pension. *See* Board Decision at 14-16; C.R. #12. Here, the payments Claimant received were not in the nature of a pension and therefore are governed by Section 319 of the Act, which expressly allows an employer to subrogate non-pension disability payments made in lieu of workers' compensation benefits pending the outcome of a litigated claim petition to the extent of "the amount so paid" by the employer. 77 P.S. § 671. We therefore reverse the Board's order to the extent that it affirmed the WCJ's determination that the short-term disability benefits Claimant

27

received were to be credited to Employer net of federal, state, and local tax withholdings.

## IV. Conclusion

Accordingly, we: (1) affirm the Board's conclusion that Claimant sustained a work-related disabling injury on September 14, 2016; (2) affirm the Board's conclusion that Claimant was eligible for workers' compensation benefits beginning on September 20, 2016; and (3) reverse the Board's conclusion that the short-term disability benefits Claimant received were to be credited to Employer net of federal, state, and local tax withholdings.

_____
CHRISTINE FIZZANO CANNON, Judge

28

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

West Penn Allegheny Health :
System, Inc. and BrickStreet :
Administration Services, :
                 Petitioners :
  :
           v. :
  :
Workers' Compensation Appeal :
Board (Cochenour), : No. 85 C.D. 2020
            Respondent :

O R D E R

AND NOW, this 16th day of April, 2021, the order of the Workers' Compensation Appeal Board is AFFIRMED as to the occurrence of a work-related injury sustained by Eda Cochenour on September 14, 2016, and AFFIRMED as to the commencement of her workers' compensation benefits on September 20, 2016. The order of the Workers' Compensation Appeal Board is REVERSED as to the credit for short-term benefits paid by West Penn Allegheny Health System, Inc. to Eda Cochenour, which West Penn Allegheny Health System, Inc. may recover on a pre-tax-withholding gross basis.

_____
CHRISTINE FIZZANO CANNON, Judge